UNITED STATES of America,
Plaintiff-Appellee,

v.

Luis Carlos MENDOZA and Oscar
Tabares, Defendants-Appellants.

No. 83–3040.

United States Court of Appeals,
Fifth Circuit.

Dec. 12, 1983.

Rehearing and Rehearing En Banc
Denied March 19, 1984.

Michael J. Osman, Miami, Fla., for defendants-appellants.

John P. Volz, U.S. Atty., Harry W. McSherry, Marilyn Gainey Barnes, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before RUBIN, TATE and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Luis Carlos Mendoza and Oscar Tabares appeal their convictions for conspiracy to possess with intent to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. On appeal, they contend that the thirty pounds of cocaine seized from Mendoza's vehicle and their post-arrest oral statements should have been suppressed because the stop and search which resulted in the discovery of the cocaine and the statements were illegal.[1] Tabares also contends that the evidence was insufficient to sustain his conviction. Finding no merit to their arguments, we affirm.

I.

On September 3, 1982, narcotics officers of the Jefferson Parish Sheriff's Department (JPSD) were informed by an agent of the Drug Enforcement Administration (DEA) that the DEA had received information from an anonymous source in Miami, Florida, that an individual named Oscar Tabares, living at a specified address in Gretna, Louisiana, and having a specified telephone number, would be moving a large shipment of cocaine "during the holidays"[2] from the New Orleans area to Miami.

Based on this information, narcotics officers of the JPSD established twenty-four-hour surveillance on Tabares' residence on September 3, 1982. No activity was observed on either September 3, or September 4. On September 5, 1982, at 11:30 a.m., JPSD officers followed Tabares to a motel on Veterans Highway in Metairie, Louisiana. Tabares entered Room 223 at the motel and remained there a short time. The occupant of Room 223 had registered at the motel under the name of Francis Gomez and had given a Miami, Florida, address. While there, Tabares and the room's occupant had a loud argument in Spanish. Af-

1. On appeal, the government seeks to question Tabares' "standing" to complain of the search of Mendoza's automobile. As the government raised no issue of standing below, we decline to consider its contentions in this regard and accordingly assume, as all parties did in the trial court, that Tabares has sufficient standing.

*Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *United States v. Sanchez,* 689 F.2d 508 (5th Cir.1982).

2. The period from Friday, September 3, 1982, through Monday, September 6, 1982, was the Labor Day holiday weekend.

ter leaving Room 223, Tabares made a telephone call from a pay telephone. He then got in his vehicle and drove, in an erratic manner "as if giving the impression he was trying to look for a tail," to his home.

At approximately 6:00 p.m. on September 5, an unidentified individual arrived at Tabares' residence. A short time thereafter, both he and Tabares were observed making a thorough search of the undercarriages of both vehicles.

After Tabares had left Room 223 on September 5, JPSD officers maintained a surveillance of that room. At approximately 10:15 a.m. on September 6, Lt. Anthony Soto of the JPSD narcotics division observed a man (presumed to be Gomez) leave the room with a small carrying case and proceed on foot in a westbound direction down Veterans Highway. Followed by Lt. Soto, the man walked to a Wilson's department store where he was observed walking around and continually looking over his shoulder. After leaving the store, he walked into a dead-end lot. He then walked across Veteran's Highway to a restaurant where he remained about two minutes. After leaving the restaurant, he walked to another restaurant where he made a telephone call. Minutes later he was picked up by a cab and taken to the airport.

At the airport, Lt. Soto and a DEA agent, Ben Morse, stopped the man and asked for identification. Identification was supplied which showed the man to be Francisco Garcia. Garcia told the officers he resided in New York. He provided them with a Florida driver's license which listed a Miami address. While claiming he was an Ecuadorian citizen, he presented an Argentinian passport. The officers then allowed Garcia to board his flight to Miami.

Meanwhile, Tabares, also under surveillance by the JPSD, had left his residence and driven to a supermarket where he used a pay telephone before returning home. At approximately 11:50 a.m., he again left his

residence and drove to the Marriott Hotel where he met a man who was driving a Ford automobile with a temporary Florida license tag in its rear window. Tabares and this individual left the hotel in their respective automobiles and proceeded by a direct route to Williams Boulevard. After they turned onto Kenner Avenue, the cars were driven in "an erratic manner" [3] to a warehouse at 1404 Kenner Avenue. The Ford automobile bearing the temporary Florida license tag was then driven into the warehouse through its sliding garage-type door. Tabares parked his automobile outside the warehouse, walked inside the warehouse, and closed its sliding door. Tabares and the other man remained inside the warehouse for forty-five minutes. The Ford automobile was then driven out of the warehouse by the other man who was observed to be perspiring heavily. Tabares then got into his automobile and, with the Ford automobile following, drove along Williams Boulevard in a northbound direction.

At this time, Lt. Soto and Agent Morse, who had been trailing Gomez-Garcia and who had just questioned him at the airport, were still at the airport when they learned by radio of the meeting at the Marriott Hotel between Tabares and the unidentified man (later identified as Luis Carlos Mendoza) who was driving an automobile with a Florida tag, their trip to and stop at the Kenner warehouse, and their departure from the warehouse in their automobiles. After a conference with a JPSD supervisor, it was decided that both cars should be stopped. The stop was made at the intersection of Williams Boulevard and Airline Highway by eight to ten police officers. The police approached Tabares and Mendoza, who was driving the Ford, and ordered them to exit their vehicles. They were both frisked for weapons and placed in the back of a police cruiser. No weapon was discovered.

After the vehicles were moved from the intersection by the police, Tabares and Men-

---

**3.** The following explanation was given at the suppression hearing as to what was meant by the expression, "driving in an erratic manner":

"They made a bunch of different turns around blocks and gave us the impression they were looking for some type of tail. . . ."

doza were removed from the vehicle for interrogation. As Mendoza was being questioned, Agent Morse began a security search of Mendoza's automobile. He searched the front seat area and the trunk area. He found no weapon. Agent Morse then began to search the rear seat area. He observed that the corner of the rear seat was "sticking up" three or four inches. He then grabbed the back seat and forcibly pulled it apart. When he did this, he discovered a two-pound package of what was later determined to be cocaine.

. As Agent Morse was searching the rear seat area, Lt. Soto asked Mendoza for permission to search his automobile. Mendoza orally consented to the search of his automobile. After the package was discovered, Lt. Soto asked Mendoza if there was any more cocaine in the automobile. Mendoza told him that there were more packages behind the rear seat but that a special tool would be needed to remove the seat. Tabares and Mendoza were formally arrested and taken, along with the automobiles, back to the warehouse. There the officers found twenty-eight one-pound packages of cocaine behind the rear seat of Mendoza's car. No cocaine was found in Tabares' automobile. Both Tabares and Mendoza made post-arrest statements admitting their guilt.

After a hearing was held on the motion to suppress the thirty pounds of cocaine seized during the search of Mendoza's vehicle, the district court denied the motion. It held, in effect, that there was a proper investigatory stop of Mendoza's automobile followed by proper advice of rights after which Mendoza consented to the search of his automobile.

After a non-jury trial, Tabares and Mendoza were found guilty of conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. They were each sentenced to twenty years. This appeal followed.

## II.

In contending that the trial court erred in denying the motions to suppress the cocaine seized from Mendoza's automobile, the ap-

pellants argue that the stop and search of the two vehicles was not supported by either reasonable suspicion of criminal activity or probable cause. Assuming *arguendo* that the initial detention was a valid stop pursuant to the rules of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), they contend that the length of the detention and the substantial intrusion of Agent Morse's warrantless search went beyond the bounds of a permissible *Terry* investigation, thereby requiring suppression of the cocaine.

Mendoza and Tabares also contend that any arguable consent to search given by Mendoza was invalid because it was fatally tainted by the prior illegal arrest/detention and search. Further, they argue that the consent cannot validate this illegal search because it was not freely and voluntarily given and was also given subsequent to Agent Morse's initial search.

The government argues that the search was justified under the automobile exception after an arrest or, in the alternative, as a limited protective search after a reasonable *Terry* stop and as a consent search by Mendoza. The government also contends that under the totality of circumstances standard for determining probable cause as set forth in the Supreme Court's decision in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527, sufficient probable cause was established in this case to justify the warrantless search of Mendoza's automobile.

In response to the government's *Gates* argument, Tabares and Mendoza argue that a comparison of the facts in *Gates* and in the present case, clearly shows that the initial stop of Mendoza's vehicle was illegal because the totality of the known circumstances was not sufficient to justify the stop and search. They point out that the informant's tip in *Gates* was very detailed concerning the modus operandi of the drug transaction that was to occur, while here the tip was noticeably lacking in detail concerning such information as the source of the cocaine, where it was stored, how it was to be transported to Florida, and other rele-

vant matters. They also argue that unlike *Gates,* the external police investigation neither corroborated a detailed tip nor provided sufficient additional and inherently suspicious facts to support the stop and search of Mendoza's automobile.

### III.

■ A warrantless search of an automobile stopped by police officers who have probable cause to believe that an automobile contains contraband is permissible under the fourth amendment. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). This principle was reaffirmed and clarified in the Supreme Court's decision in *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), holding that police officers who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it may conduct a warrantless search of the automobile that is as thorough as a magistrate could authorize by warrant. Based on these cases, it follows that if the police officers, through their collective knowledge,[4] had probable cause to believe that contraband was contained in Mendoza's automobile, their warrantless search of that automobile and the seizure of the thirty pounds of cocaine found therein, was lawful.

■ In view of the fact that this case was initiated by an informant's tip, our determination as to whether probable cause existed for a warrantless search of Mendoza's automobile must be guided by the Supreme Court's *Gates* decision. In *Gates,* police received a tip that the Gates were selling drugs; that Ms. Gates would drive to Florida to have her car loaded with drugs; that Mr. Gates would fly down a few days later to drive the car back home; that the car's trunk would be loaded with drugs; and that they had over $100,000 worth of drugs in their basement. Acting

on the tip, a police officer learned their address and that Mr. Gates had made a reservation for a flight to Florida. Surveillance disclosed that Mr. Gates took the flight, stayed overnight in a motel room registered to his wife, and left the following morning with a woman in a car licensed to Mr. Gates. A search warrant for their house and automobile was then obtained. When they arrived at their home, a search was made during which the officers discovered contraband. The state courts ordered suppression of the contraband. The Supreme Court reversed, holding that the "totality of the circumstances" supplied probable cause for the issuance of the warrant.

In *Gates* the Court abandoned the rigid "two-pronged test" under *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), for determining whether an informant's tip establishes probable cause for issuance of a warrant.[5] In its place, the Court substituted a "totality of the circumstances" approach that traditionally has informed probable cause determinations. The Court stated:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Gates,* 103 S.Ct. at 2332 (citations omitted).

While agreeing that an informant's "veracity," "reliability" and "basis of knowledge" are all highly relevant in determining the value of an informant's tip, the Court

---

4. *United States v. Sanchez,* 689 F.2d 508, 512 (5th Cir.1982).

5. We recognize that *Gates* dealt with probable cause for the issuance of a warrant for the search of a vehicle and a house. This determi-

nation of probable cause, however, is applicable to both warrant and warrantless searches. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

stated that they were to be understood simply as

closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place. [A] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

*Gates,* 103 S.Ct. at 2328, 2329.

The Court, in *Gates,* also pointed out that innocent behavior can provide the basis for a showing of probable cause. As the Court stated: "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Gates,* 103 S.Ct. at 2335 n. 13.

With these principles in mind, it becomes our task to determine whether all the items of evidence, i.e., the totality of the circumstances, known to the police officers on September 6, 1982, would have been sufficient to justify a reasonable man in the belief that Mendoza's automobile contained contraband. If this were the case, the warrantless search of· Mendoza's automobile and the seizure of the cocaine found therein was not unlawful.

In this case, the police officers had received information through an anonymous informant that Oscar Tabares would be moving a large amount of cocaine from New Orleans to Miami over the holidays. The Labor Day holiday weekend was approaching. The police officers established surveillance of Tabares which revealed the following details: (1) Tabares drove to and from various locations in a manner calculated to elude surveillance; (2) Tabares made use of pay telephones; (3) Tabares made a thorough inspection of the undercarriage of his automobile; (4) on September 5, 1982, Tabares went to a hotel room which had been registered to a man with a Miami, Florida, address; (5) on September 6, 1982, a man, observed leaving the hotel room which Tabares had visited the previous day, proceeded to the airport in a manner which was clearly calculated to elude surveillance; (6) after being asked to identify himself at the airport, the man produced identification in the name of Francisco Garcia (the room had been registered to Francis Gomez), a Florida driver's license which listed a Miami, Florida, address, an Argentinian passport, while he claimed to reside in New York and to be an Ecuadorian citizen; (7) on September 6, Tabares met with a man (later identified as Mendoza) who was driving a Ford car with a temporary Florida license tag and both men proceeded, in a manner apparently calculated to elude surveillance, to a warehouse; (8) the Florida-licensed automobile was driven into the warehouse while Tabares parked his car outside; Tabares and Mendoza remained for forty-five minutes behind closed doors in a warehouse with no apparent air conditioning; and (9) the Ford automobile was then driven from the warehouse by Mendoza who was observed to be perspiring heavily.

We clearly recognize that the individual details listed above might also be consistent with innocent behavior. Entirely innocent individuals use pay telephones immediately after leaving their homes and meet with persons having Florida connections, for example. As the police officer testified at the evidentiary hearing, however, these enumerated details, especially when considered as a whole, are indicative of individuals involved in illegal drug transactions. Thus, when considered with the informant's tip, Tabares' conduct, the highly suspicious Gomez-Garcia, Tabares' meeting with Mendoza, the evasive trip to the warehouse, the forty-five minute interval in which the Florida Ford was inside the warehouse, and Mendoza's appearance on emerging are all consistent and reasonably indicative of the conclusion that Mendoza's vehicle was loaded with contraband. Consequently, these non-criminal acts could well form part of the basis upon which probable cause attached. *Gates,* 103 S.Ct. at 2335 n. 13.

Unquestionably, no one item of the government's evidence, considered in isolation, would have been sufficient to justify a reasonable man in the belief that Mendoza's automobile contained contraband. Nonetheless, to experienced narcotics agents familiar with the methods employed by drug traffickers, the totality of the circumstances, including the informant's tip, did establish probable cause to believe that Mendoza's car was being used to transport seizable contraband. The events of September 5 and 6, otherwise consistent with innocent behavior, had combined with the tip to reach a point where a reasonable and cautious man could believe that a criminal course of conduct was substantially more likely than an innocent one.

Standing alone, the facts obtained through the surveillance of Tabares at least suggested that contraband was being transported in Mendoza's vehicle. In addition, the informant's tip had been corroborated in substantial part by that surveillance. The identity of Tabares, as well as his address, had been verified, the time frame was correct, and a connection with Miami and other Florida-based individuals had been established. Unlike the case in *Gates,* none of the developments had proved to be inconsistent with the tip. The corroboration of the Miami, Florida, connection; the fact that this connection was established during the proper time period; and all of the evasive and suspicious conduct established by the surveillance indicated to a reasonable police officer that the informant's assertion about the transportation of contraband was also correct. As the Court said in *Gates,* "[t]his may well not be the type of 'reliability' or 'veracity' necessary to satisfy some views of the 'veracity prong' of Spinelli but we think it suffices for the practical common-sense judgment called for

in making a probable cause determination." *Gates,* 103 S.Ct. at 2335.

We must always remember that police, unlike appellate judges, must make probable cause determinations under the pressure of time and in the immediate context of fast-developing events. When considered in the totality of the circumstances, the swift police response was responsible and reasonable—in short, constitutional. Having probable cause to believe that Mendoza's automobile contained seizable contraband, cogent circumstances justified the officers' stop and warrantless search of the car. *United States v. Ross,* 102 S.Ct. at 2164.[6]

## IV.

█ Tabares and Mendoza contend that the trial court erred in denying the motions to suppress their oral statements. From our discussion above, it follows that the post-arrest oral statements were not the result of an illegal arrest. *Cf. Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). There was also ample evidence in the record to support the district court's decision that Mendoza and Tabares had knowingly and intelligently waived their fifth amendment privilege against self-incrimination in making the statements.

## V.

█ Tabares challenges the sufficiency of the evidence on the conspiracy and the substantive possession counts. In considering this challenge, the record is to be read in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 461, 86 L.Ed. 680 (1942), and, from that view we will determine whether the conviction is supported by substantial evidence. *United States v. Dreyfus-de*

---

**6.** In view of our disposition of the case, we do not decide the applicability of *Terry* nor do we decide whether there was a valid consent to the search of Mendoza's automobile. Furthermore, we do not consider whether the police should have merely stopped and detained the automobile and then proceeded to the magistrate for a search warrant; either the facts here

support probable cause or they do not. The formality of a warrant would not have changed the context of our analysis and determination here for the reason that warrantless searches are clearly permissible *upon probable cause,* see *Carroll* and *Ross, supra,* the same standard required for a warrant.

*Campos,* 698 F.2d 227 (5th Cir.1983). To uphold the conviction on the conspiracy count, we must be satisfied that the government proved beyond a reasonable doubt that Tabares had "the deliberate, knowing, specific intent to join the conspiracy." *United States v. De Simone,* 660 F.2d 532, 537 (5th Cir.1981), *citing United States v. Morado,* 454 F.2d 167, 175 (5th Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972).

The elements of the crime of conspiracy to possess are: (a) unlawful agreement, (b) knowledge of the unlawful agreement, (c) intent to join and (d) participation of each of the co-conspirators. *United States v. Dreyfus-de Campos,* 698 F.2d at 230. Viewed according to *Glasser,* the record contains sufficient evidence to satisfy the requirements of the conspiracy offense.

■ A surveillance of Tabares revealed his driving in a manner calculated to elude surveillance and his meeting with Mendoza at a New Orleans hotel. Thereafter, driving his own automobile, Tabares led Mendoza to a warehouse which he managed. Upon arrival at the warehouse, Tabares entered along with Mendoza's vehicle and emerged forty-five minutes later. Tabares, followed by Mendoza in his vehicle, drove away from the warehouse. A short time later, the vehicles were stopped and a two-pound package of cocaine was discovered in Mendoza's automobile. A more thorough search revealed an additional twenty-eight pounds of cocaine. Tabares gave a post-arrest statement in which he stated that he had met his employer, Fabian Leon, at the New Orleans Airport on September 1. According to Tabares, he had driven Leon to the warehouse where Leon left a suitcase containing cocaine. Leon told Tabares that someone would be in touch with him with regard to moving the cocaine.

Drawing all reasonable inferences from these evidentiary facts, there was a sufficient evidentiary basis to sustain the trial judge's finding of Tabares' guilt on the conspiracy count beyond a reasonable doubt.

Although the indictment charged Tabares with possession with intent to distribute, the proof at trial makes it clear that the conviction on the substantive count rests on the conclusion that Tabares aided and abetted Mendoza. Thus the question becomes whether the evidence and all reasonable inferences favoring the government's position are such that the trial judge, acting as the trier of fact in this case, could reasonably and logically infer that Tabares was guilty beyond a reasonable doubt of aiding and abetting the possession of cocaine with intent to distribute. *United States v. Smith,* 546 F.2d 1275 (5th Cir.1977); *United States v. Bright,* 541 F.2d 471 (5th Cir.1976).

■ After reviewing the evidence referred to above which was also offered in support of the substantive possession count, we believe that there was a sufficient evidentiary basis upon which the trial judge could find that Tabares was guilty beyond a reasonable doubt of aiding and abetting the possession of cocaine with intent to distribute. Tabares could have been convicted of aiding and abetting the distribution of the cocaine because of his participation in the overall criminal venture. There was also evidence that he helped Mendoza obtain the cocaine. Furthermore, as in this case, the possession of a quantity of narcotics so large that it could not be used by the possessor alone justifies the conclusion that possession was for distribution rather than personal consumption. *United States v. Richards,* 638 F.2d 765, 769 (5th Cir.1981), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981).

For the above and foregoing reasons, the convictions of Mendoza and Tabares are

AFFIRMED.