**The STATE of Utah, Plaintiff and Respondent,**

v.

**Joseph P. DORSEY, Defendant and Appellant.**

**No. 20124.**

Supreme Court of Utah.

Dec. 31, 1986.

G. Fred Metos, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Associate Chief Justice:

Defendant Joseph P. Dorsey appeals his conviction of possession of cocaine with intent to distribute for value in violation of U.C.A., 1953, § 58–37–8. On appeal, he argues that the trial court erred in not excluding from evidence cocaine found during a warrantless search of his truck. We affirm.

Late on March 6 or early on March 7, 1983, Detective Russell Adair of the Metro Narcotics Strike Force made a warrantless search of Dorsey's truck and found one pound of cocaine packaged in sixteen one-ounce packages. The events leading up to that search were as follows.

In late February, 1983, Detective Charlie Hafen of the Metro Narcotics Strike Force met with informant John McGraw and Brian Schiell. Hafen sought to purchase a large amount of cocaine from Schiell, who indicated that he could obtain the cocaine for Hafen. When Hafen and Schiell met several days later, Schiell told Hafen that the suppliers would be driving from California and would be in town within several days. Hafen understood from Schiell that the suppliers were male and that more than one person would make the delivery. On March 6, 1983, Schiell informed Hafen that the suppliers were in town with the cocaine and wanted to complete the transaction that night.

At a briefing that night of other Metro Narcotics Strike Force officers, Hafen informed them that he believed the deal was going to take place that night at the La Quinta Motel. He also informed them that he had $32,000 in marked police money with which to purchase one pound of cocaine from someone driving from California, that he was not sure whether the transaction would be face-to-face or whether it would take place through go-betweens, and that Brian Schiell and possibly Schiell's contact with the supplier, Scott Vaughn, would be there. Adair attended that briefing.

Hafen was then equipped with a body microphone, and transmitter, which made it possible for two other officers equipped with a receiver to hear everything that Hafen said. The officers with the receiver were the only officers who could hear Hafen's transmissions.

Hafen and John McGraw picked up Schiell and met Schiell's contact with the supplier, Scott Vaughn. They drove to the La Quinta Motel where protracted negotiations ensued with Schiell and Vaughn acting as go-betweens between Hafen, who was sitting in his car in the parking lot of the motel, and the people inside the motel with the cocaine, over whether the money or the cocaine would be turned over first. Several strike force detectives were in automobiles surrounding the motel, and one detective was on the second floor inside the motel. At one point during the negotiations, when both Schiell and Vaughn were out of the car, Hafen transmitted a description of them, stating that one of them was wearing a dark leather jacket. The officers who received that transmission then rebroadcast it to the other officers surrounding the motel, but did not mention that the person wearing the dark leather jacket was either Schiell or Vaughn.[1]

---

1. The concurring opinion erroneously assumes that Adair was aware that the person in the dark leather jacket was Schiell or Vaughn, whom everyone involved knew did not have the cocaine. From this, the concurring opinion concludes that the information concerning the dark leather jacket could not form a basis for probable cause. However, Adair was not aware that the original broadcast described one of these go-betweens since the broadcast he heard stated only that "someone" in a dark leather jacket was involved in the transaction. Furthermore, Dorsey, wearing a dark leather jacket, was seen getting in and out of the pickup truck with California license plates that was parked in the motel parking lot. Later, a person wearing the same attire was seen getting into the pickup shortly after the negotiations ended when the people negotiating to sell the cocaine exited the motel.

Adair, who was in a parked car to the northwest of the motel, heard that broadcast.

Shortly thereafter, the detective inside the motel broadcast that there was a person in a leather jacket who seemed to be involved in the transaction moving around in the parking lot. Adair heard that broadcast. The same detective also broadcast, after conferring with the motel managers, that Rooms 131 and 137 appeared to be the rooms involved in the transaction. The next transmission Adair heard was from two other detectives located in the parking lot, who observed a man in a dark leather jacket walk to a pickup truck located in the motel parking lot, get in and out of the truck, and then walk back toward the motel. They described the truck as a silver, recent-model Chevrolet S-10 with California plates with the numbers 3535. They said the man, who was looking around the parking lot, then walked over to and stood behind a dumpster and continued to observe the parking lot. At that point, Adair drove through the parking lot and observed a white male, who was wearing a dark leather jacket, standing behind the dumpster. At trial, he identified Dorsey as the man he saw.

Adair later heard a transmission stating that the deal could not be put together and that it was therefore called off. Almost immediately thereafter, the detective located on the upper floor of the motel broadcast that the people in Rooms 131 and 137 were leaving the building. Within two minutes of that broadcast, one of the detectives in the parking lot broadcast that he saw two people, one of whom was wearing a dark leather jacket, leave the motel and get into the truck with California license plates and drive off. Adair pulled out behind the truck, got close enough to determine that it had California license plates

with the numbers 3535, and followed the truck for approximately thirty blocks. When the truck began to make a U-turn, Adair pulled up on the driver's side of the vehicle, blocking the truck's further movement. Dorsey then rolled down his window. When Adair identified himself as a police officer, Dorsey rolled up the window, picked up something that was between the passenger and the driver, and stuffed it on the floor between his legs. Dorsey and his passenger got out of the truck, and Adair frisked Dorsey. The passenger was put under the control of one of several other detectives who had pulled up behind Adair. Adair searched the floor on the driver's side of the truck and found a paper bag containing sixteen one-ounce packages of cocaine. Adair then arrested both Dorsey and his passenger.

█ It has long been held that warrantless vehicle searches are not invalid under the Fourth Amendment if probable cause for a search exists.[2] *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *See also United States v. Johns,* 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The probable cause requirement is subject to a narrow exception for stops of moving vehicles where police officers have an articulable suspicion that the automobile's occupants are "involved in criminal activity." *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985) and *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975), discussed *infra.*

The United States Supreme Court defined probable cause for a vehicle search as

---

**2.** Article I, section 14 of the Utah Constitution is virtually identical to the Fourth Amendment. Although Dorsey refers to Article I, section 14 of the Utah Constitution in his brief, he makes no attempt to rely on any asserted difference between the state and federal provisions, and we decline to make any separate analysis under

Article I, section 14, assuming there is one to be made. We therefore address Dorsey's claims only under the federal constitutional provision. *State v. Earl,* 716 P.2d 803 (Utah 1986); *State v. Hygh,* 711 P.2d 264 (Utah 1985) (Zimmerman, J., concurring).

"a belief, reasonably arising out of the circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction." *Carroll*, 267 U.S. at 149, 45 S.Ct. at 284. *See also Draper v. United States*, 358 U.S. 307, 310, 79 S.Ct. 329, 331, 3 L.Ed.2d 327 (1959); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949).

Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

*Brinegar*, 338 U.S. at 175–76, 69 S.Ct. at 1310–11 (quoting *Carroll*, 267 U.S. at 162, 45 S.Ct. at 288).

■ The validity of the probable cause determination is made from the objective standpoint of a "prudent, reasonable, cautious police officer ... guided by his experience and training." *United States v. Davis*, 458 F.2d 819, 821 (D.C.Cir.1972). *See also Taylor v. Commonwealth*, 222 Va. 816, 820–21, 284 S.E.2d 833, 836 (1981), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1753, 72 L.Ed.2d 163 (1982). Police officers by virtue of their experience and training can sometimes recognize illegal activity where ordinary citizens would not. Some recognition should appropriately be given to that experience and training where there are objective facts to justify the ultimate conclusion. *United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *Terry v. Ohio*, 392 U.S. 1, 23 (1968); 1 W. LaFave, *Search and Seizure* § 3.2 at 462 (1978).

In *Brinegar*, the Court emphasized that probable cause does not require more than a rationally based conclusion of probability:

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical consid-

erations of every day life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

*Brinegar*, 338 U.S. at 175, 69 S.Ct. at 1310. *See also Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). The line between "mere suspicion and probable cause ... necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances." *Brinegar*, 338 U.S. at 176, 69 S.Ct. at 1311.

■ The determination of whether probable cause exists, therefore, depends upon an examination of all the information available to the searching officer in light of the circumstances as they existed at the time the search was made. *Id.* The trial court's findings as to the facts and circumstances pertaining to probable cause will not be overturned on appeal unless it appears that the trial court clearly erred. *State v. Torres*, 29 Utah 2d 269, 271, 508 P.2d 534, 536 (1973); *State v. Eastmond*, 28 Utah 2d 129, 132, 499 P.2d 276, 278 (1972); *State v. Criscola*, 21 Utah 2d 272, 275, 444 P.2d 517, 519 (1968).

■ In making a probable cause determination, a police officer is entitled to rely on information gained from other police officers. "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965). *See also, e.g., United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir.1984); *State v. Olson*, 134 Ariz. 114, 117, 654 P.2d 48, 51 (Ct.App.1982).

When Adair stopped and searched Dorsey's vehicle, he was aware that Hafen, another strike force officer, had been attempting to make a "controlled buy" of a large quantity of cocaine, that Hafen had been setting the deal up through Brian Schiell with suppliers from California who had cocaine in the La Quinta Motel, and that two of the negotiators left the room in

the motel where the negotiations had been going on. Adair was also aware that the people involved in the deal were probably staying in Rooms 131 and 137 of the motel and that someone involved in the transaction was wearing a dark leather jacket. In addition, he knew that someone wearing a dark leather jacket was seen in the parking lot carrying a bag and behaving suspiciously. He also knew that immediately after the deal was called off, the persons in Rooms 131 and 137 vacated the motel and that two people, one of whom was wearing a dark leather jacket, emerged from the motel and walked directly to the silver truck with a license plate containing the numbers 3535, near which Adair and other strike force officers had earlier seen someone in a dark leather jacket acting suspiciously.

Adair's information at the time of the search and seizure might not be sufficient by itself to establish guilt, but there clearly was sufficient evidence to establish probable cause.

Other courts have found probable cause to exist on facts similar to this case. In *United States v. Esle*, 743 F.2d 1465 (11th Cir.1984), a Drug Enforcement Administration agent met one of the defendants and tried to arrange a cocaine buy through him. Although that attempt failed, two of the defendants later met with the agent and negotiated a buy. The buy was to take place at a Marriott Hotel, which was surrounded by DEA agents. The purchasing agent did not see the cocaine, but was informed by one of the defendants that the cocaine was in a car in the parking lot. When the defendants went to get the cocaine, they simply got in the car and drove off. The purchasing agent followed them and asked what the trouble was. They told him there were DEA agents all around and they would not show him the cocaine. When they started to leave again, the purchasing agent gave the signal for their arrest. A different agent then searched the car and the trunk and found a briefcase. After obtaining a search warrant for the briefcase, the agents opened it and found the cocaine inside. *Id.* at 1468. The

court held that even though the purchasing agent had not seen the cocaine, when officers are involved together in an operation and there is communication between them, the collective knowledge of the officers is considered in determining whether there was probable cause for the search. The court also held that the information that the cocaine was in the car, which was communicated to the searching agent, was sufficient to establish probable cause. *Id.* at 1476.

In *United States v. Mendoza*, 722 F.2d 96 (5th Cir.1983), DEA agents were tipped off that a certain man would be moving a large shipment of cocaine over the Labor Day weekend. They began twenty-four-hour surveillance of his house and also began following several people who had contact with him. The individuals being watched, including the defendants, were variously observed to be walking or driving in an erratic manner, as if looking for someone following them, using pay telephones, checking the undercarriages of their cars, and driving into and out of a warehouse. The police decided to stop the vehicles. On searching Mendoza's car, they found thirty pounds of cocaine. *Id.* at 97–99. The court, in finding probable cause for the search, recognized that the individual details recited in the facts could also be consistent with innocent behavior since none of the acts observed were criminal. However, the court held that the circumstances, considered as a whole and in light of the experience of the narcotics agents, combined with the informant's tip to form a valid basis for a reasonably prudent police officer's belief that criminal conduct was afoot. *Id.* at 101–02.

In *State v. Dupuy*, 116 Ariz. 151, 568 P.2d 1049 (1977), narcotics agents, acting on a tip from one of the participants that marijuana was to be smuggled over the Arizona-Mexico border that night, followed the informant's car to a motel in Nogales, Arizona. The agents watched the informant's companion enter a motel room. Later, a camper-truck pulled into the parking lot behind the motel. Shortly thereafter,

several persons were seen entering the motel room. One of them was wearing a sheepskin jacket with fleece lining. When the defendant was arrested, he was wearing such a jacket. In about fifteen minutes, the occupants exited the motel room and went to the rear parking lot. A white truck and the camper-truck then pulled out of the parking lot. The agents stopped both trucks and found forty-nine kilos of marijuana in the white truck. The agents neither saw the trucks being loaded or unloaded nor knew who was driving them until they were stopped. *Id.* at 152–53, 568 P.2d at 1050–51. The court concluded that there was probable cause for the stop and search of the vehicles, stating that the cumulative effect of the events justified a reasonable belief that at least one of the vehicles was carrying contraband. *Id.* at 155, 568 P.2d at 1053.

■ The facts in this case were sufficient to justify a belief that cocaine was located in Dorsey's truck. Hafen dealt with Brian Schiell, who claimed he could get cocaine for him. Schiell or Vaughn claimed to have seen the cocaine and described it as being packaged in sixteen one-ounce packages. All the surveilling officers informed each other of the activities they observed in and around the motel and how they seemed to relate to the negotiations being carried on by Hafen. When Adair stopped and searched the truck, he was aware of that collective information, and even though his own actual observations were not enough to rise to the level of probable cause, the information that he had received from other officers was sufficient to conclude that there was probable cause for his stop and search of Dorsey's truck.

As stated above, automobiles may in some circumstances be stopped where police do not have probable cause to do so, but do have an articulable suspicion that the vehicle's occupants are "involved in criminal activity." *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) and *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). *See generally Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Nevertheless, the precise scope of the articulable suspicion standard with respect to the search of automobiles has not been decided by the United States Supreme Court. *See generally Hensley,* 105 S.Ct. at 680–81; *Michigan v. Long,* 463 U.S. 1032, 1046–47, 103 S.Ct. 3469, 3479–80, 77 L.Ed.2d 1201 (1983). *See also Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

Since both the search and seizure in this case were properly conducted under the probable cause standard, we need not address the articulable suspicion standard relied on in the concurring opinion.

Affirmed.

HALL, C.J., and HOWE, J., concur.

ZIMMERMAN, Justice: (concurring in the result).

I dissent from the majority's determination that Adair's search of defendant Dorsey's truck was proper because Adair had probable cause to believe that the truck contained cocaine. However, analyzing the stop and subsequent search under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), I conclude that Adair did have an articulable suspicion that the truck's occupants were involved in criminal activity and did have an articulable and objectively reasonable belief that the occupants were potentially dangerous. Therefore, he acted reasonably in stopping the truck and searching its interior for weapons, and his actions do not violate the fourth amendment to the United States Constitution. I therefore concur with the result of the majority opinion: the contraband discovered in the search was properly admissible.

The majority concludes that the search of the truck was permissible because the fourth amendment allows warrantless searches of vehicles if those searches are

based on probable cause.[1] It then attempts to draw together various disparate facts known by officers present at the motel to paint a picture complete enough to give Adair probable cause to believe that the occupants of the truck were in possession of a pound of cocaine. In my view, the picture that emerges is so sketchy that if it had been presented to a neutral magistrate, he or she would not have been justified in issuing a warrant to search the truck for cocaine; therefore, the search was unconstitutional and the evidence seized must be excluded under the fourth amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

A careful examination of the facts known to Adair shows that there was simply nothing beyond suspicion to connect the "man in the leather jacket" and the "truck with California plates" with the aborted cocaine transaction; certainly, nothing Adair knew would support a finding that he had probable cause to believe that the pound of cocaine was located in the truck.

Despite the contrary suggestion in the majority opinion, Adair knew nothing at the time of the stop that connected the truck's occupants with rooms 131 and 137 of the motel, the rooms where the cocaine transaction was being negotiated and where the police might reasonably have suspected the possessor of the cocaine to have been located. Instead, Adair knew only that a man in a leather jacket had walked to a truck bearing California plates located in the parking lot of a large motel and had then stood near a dumpster looking around the parking lot for a period of time. This man he identified as Dorsey. There was some mention in the police broadcasts that either Schiell or Vaughn, the two persons intimately involved in the drug transaction and with whom Hafen was dealing face-to-face, was wearing a dark leather jacket, and the majority seems to suggest that this information gave Adair reason to believe that the man in the leather jacket who got into the truck and drove away was one of these persons. However, these facts would not lead a reasonable person to believe that either Schiell or Vaughn was the person Adair associated with the truck. Since Schiell and Vaughn were shuttling back and forth between rooms 131 and 137 and the car where Hafen was sitting, obviously neither of them could have been the person who, during the same period of time, walked to the truck and then stood near the dumpster for an extended period.

A final reason why I cannot accept the majority's determination is that Adair never claimed to have probable cause to believe that the truck carried the cocaine. Adair stopped the truck only because its leather-jacketed occupant's actions had raised a suspicion that he somehow was involved in the transaction and because another officer directed Adair to make the stop and to identify the occupants of the truck.

There is an alternative ground for finding the search lawful that does not strain either the facts or the law. An officer lacking the probable cause necessary to justify the issuance of a search or arrest warrant may still stop a person for investigative questioning if the officer has an articulable suspicion that the person is engaged in or is about to engage in criminal

1. I agree with the majority that the legality of the search should be addressed only under the federal constitution because defense counsel has not briefed the issue under the Utah Constitution. However, as I have suggested elsewhere, I do not accept the proposition that in interpreting the search and seizure provision in the Utah Constitution, article I, section 14, we should slavishly follow the ever-quickening trend started by the United States Supreme Court in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), of eroding the warrant protections that have long been central to American search and seizure law, simply because the place to be searched is a motor vehicle. *See State v. Hygh*, 711 P.2d 264, 271, 273 n. 3 (Utah 1985) (Zimmerman, J., concurring). For all intents and purposes, Utah's constitutional provision has lain dormant since its passage in 1896. Its meaning needs to be fleshed out, but there is nothing in law or logic to suggest that the form that emerges from that process must be a copy of what the United States Supreme Court has made of the fourth amendment in the years since 1896.

activity. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *State v. Folkes*, 565 P.2d 1125 (Utah), *cert. denied*, 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed.2d 461 (1977); *State v. Elliott*, 626 P.2d 423 (Utah 1981); *see Coleman v. State*, 553 P.2d 40, 46 n. 19 (Alaska 1976).[2] In the present case, the facts known to Adair did give rise to an articulable suspicion that the occupants of the truck were somehow involved in the aborted cocaine transaction. The rather confusing references to the leather jacket, Dorsey's surreptitious surveillance of the parking lot for an extended period of time, the California plates, and the fact that the truck left the parking lot almost immediately after the transaction fell apart all gave Adair grounds to stop the truck and ask its occupants questions about possible involvement in the cocaine transaction.

Once an investigative *Terry* stop is made, the officer has the right to take steps reasonably necessary to protect himself from assault by the suspect during the stop. According to the *Terry* Court, a narrowly circumscribed search for weapons is permissible if the officer "is justified in believing that the individual ... is armed and presently dangerous to the officer or to others...." *Terry v. Ohio*, 392 U.S. at 28, 88 S.Ct. at 1883. This search can extend beyond the suspect's person to the area "within his immediate control." *Chimel v. California*, 395 U.S. 752, 763 (1969).

In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court considered the permissible scope of such a weapons search when an automobile stop was involved. It concluded that a search of the

> passenger compartment of an automobile, limited to those areas in which a

weapon may be placed or hidden, is permissible

> if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* at 1049, 103 S.Ct. at 3481 (quoting *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879). The legality of the search in the present case is a close call even under *Long*. However, I conclude that the trial court did not err in finding it permissible.

Here, Adair had a reasonable basis for suspecting Dorsey of being involved in a large, wholesale narcotics transaction that involved the transportation of the drugs from California to Utah. Adair reasonably could assume that those participating in moving large quantities of illegal drugs over long distances might be armed to protect themselves from criminals who might attempt to "rip-off" a drug dealer. Dorsey's truck did bear California license plates. When Adair announced who he was, Dorsey made a furtive gesture, which consisted of taking something off the seat and placing it between his legs on the floor of the car. Given the dangers always present when an officer confronts suspects in an automobile, *id.* at 1048 n. 13, 103 S.Ct. at 3480 n. 13. I conclude that, under the circumstances, Adair was justified in concluding that the occupants of the truck might be armed and a danger to himself and the other officers.

The most difficult aspect of this matter is presented by the fact that at the time Adair searched under the seat, the truck's occupants were standing by the rear of the truck under control of several officers holding drawn weapons. Dorsey contends that,

---

**2.** I see no merit in the majority's rather odd suggestion that because it finds some unexplained uncertainty in the *Terry* doctrine as it is applied to vehicles, that uncertainty somehow justifies the majority's refusal to even consider the more lenient *Terry* standard for permitting warrantless searches. Instead, the majority resorts to torturing the facts in order to satisfy the much higher probable cause standard by which all warrants must be tested. Because of the majority opinion's implications for searches conducted with and without warrants, I consider the majority's aversion to the narrower *Terry* test quite impossible to understand.

under these circumstances, it is entirely unrealistic for the officers to fear that weapons that might be located in the truck cab would present a threat to their safety, since the truck's occupants were constrained effectively some distance from the cab.

This claim has some appeal. There are various degrees of restraint. Plainly, if a suspect is handcuffed or otherwise taken into custody and physically secured, there is little real likelihood that he will be able to retrieve a weapon from some remote location. But we are not dealing here with a suspect who has been handcuffed and belted into a police car—common steps taken to secure prisoners. Nor are we dealing with suspects who have been arrested or taken into custody. Instead, we have two persons who have been stopped for investigation and are standing outside their vehicle late at night. Had they not been

subsequently arrested, they might have reentered their vehicle and presented a threat to the officers. Under these circumstances, we should not second guess the officers, at least when the trial court found this fear reasonable.[3]

Based on the facts known to Adair at the time of the stop and the fourth amendment teachings of *Long*, I conclude that the search was lawful as incident to a *Terry* stop. Therefore, I join the majority in affirming the conviction.

DURHAM, J., concurs in Justice ZIMMERMAN'S concurring opinion.

---

**3.** Moreover, the facts of *Long* appear to make it controlling on this question. There, the suspect was standing at the rear of his car in the company of an officer at the time another officer searched the passenger compartment. He contended that since he was not in the vehicle and was effectively under control of one of the officers who had stopped to question him, they reasonably could not have feared for their safety. However, the Court rejected this claim, reasoning that a suspect might

break away from police control and retrieve a weapon from his automobile.... In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.

*Id.* at 1051–52, 103 S.Ct. at 3481–82 (citations omitted).