UNITED STATES of America, Appellee,

v.

**Abdul SAMAD, Appellant.**

UNITED STATES of America, Appellee,

v.

**Babry HANAN, Appellant.**

Nos. 83–5090, 83–5091.

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1984.

Decided Sept. 26, 1984.

As Amended on Denial of Rehearing and Rehearing En banc Denied Feb. 22, 1985.

---

Kenneth E. Labowitz, Alexandria, Va., for appellant in No. 83–5090.

Dorathea J. Peters, Alexandria, Va., for appellant in No. 83–5091.

William G. Otis, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., and Thomas M. Buchanan, Asst. U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and ELIZABETH V. HALLANAN, United States District Judge, for the Southern District of West Virginia, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

Abdul Samad and Babry Hanan appeal their respective jury convictions for importation of heroin and possession of heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1); 952(a) and 960.[1] Samad contends, first, that there was insufficient evidence to support his convictions, and, second, that the trial court erred in admitting evidence tending to show that he had received welfare benefits illegally. Hanan also challenges the sufficiency of the evidence and argues, as well, that the prosecutor's reference in jury argument to a matter not in evidence constituted reversible error. We affirm Hanan's convictions, but reverse Samad's convictions because the evidence was legally insufficient to convict him on either offense charged.

## I

The convictions arise out of the DEA's controlled delivery of a mailed package containing heroin to the address in Alexandria, Virginia, where Samad and Hanan then resided. Both Samad and Hanan were born in Afghanistan and their residence—a two-bedroom apartment at 324 South Whiting Street—was in the midst of a community that included a number of Afghans. Both appellants had fled Afghanistan following the Soviet invasion of that country and were granted political asylum in the United States. Hanan, who was the lessee

---

1. Appellants were also indicted on two counts of conspiracy; the trial court directed verdicts of acquittal on these offenses.

of the apartment where the two resided, entered this country on March 3, 1980. After three months in New York, he moved to the Washington, D.C. area and eventually settled in the South Whiting Street apartment, where he had lived for about one year prior to the date of the trial in March 1983. Hanan owned and drove a taxicab and was conversant in English, a language he had learned while attending school abroad in London. Hanan's family resided in Peshawar, Pakistan.

Samad left Afghanistan in February 1980 and came to the United States by way of West Germany in September 1981. While residing at a friend's apartment in Alexandria, he worked part time at several jobs: as a doorman, a driver for a car rental agency, and as a restaurant employee.[2] In addition, Samad attended school, where his instructors taught in English. Samad's actual grasp of the English language, however, is in doubt; at trial, he testified through an interpreter.[3]

Samad moved into Hanan's apartment on South Whiting Street approximately a year prior to trial. For much of the intervening time, the apartment served as a temporary dwelling for the pair's Afghan friends. As many as six persons shared the two-bedroom apartment at one point, although Hanan and Samad were its exclusive occupants for at least three months prior to their arrest in January 1983.

The events leading up to the conviction of appellants began on January 4, 1983, when customs officials at Kennedy International Airport opened a package mailed from Peshawar, Pakistan[4] addressed to a "M. Amin" at 324 South Whiting Street in Alexandria.[5] Contained in the package were a shirt and a "wrap around" pair of pants. Underneath and sewn inside the shirt collar was a plastic bag containing approximately twenty-two grams of 72% pure heroin.

On January 6, the DEA arranged for a controlled delivery of the package to appellants' address at 324 South Whiting Street. After removing the majority of the drug to test it, the DEA placed the remainder, still in the plastic bag, back under the shirt collar. The pouch was not sewn back into the collar, but was placed under the collar, presumably "out of the view of anyone who would open the package without looking for it." The DEA resealed the package after enclosing a beeper designed to emit a signal when the package was opened.

On January 11, the local letter carrier, acting pursuant to the DEA's instructions, delivered the package to appellants' residence at South Whiting Street. Samad answered the mailman's knock on the door. The letter carrier asked for "M. Amin," the addressee on the package, and, according to the letter carrier's testimony, Samad replied "Yes," whereupon the mailman handed him the package. As the mailman turned to walk away, Samad asked him if he needed to sign for the package. The mailman responded in the negative.[6]

Both Samad and Hanan testified as to the events that took place inside the residence immediately after Samad's receipt of the package. According to the testimony

---

**2.** At trial, Samad testified that he was then unemployed; that he had last worked about four months prior to the date of the trial.

**3.** Samad testified that he could not read English as well as he could understand it when spoken. He did testify, however, that he understood from the package's return address that the package was from Pakistan.

**4.** The return address was "Sultan Ahmad Sader Bazar, near Gora Bazar, Shop No. 15, Peshawar, Pakistan."

**5.** One customs official testified that the package was addressed to "3211 South Whiting Street." The jury reasonably could have found from other evidence, however that the address was "324 South Whiting Street."

**6.** Samad testified that he did not understand what the letter carrier said when presenting him with the package. He stated that he did ask the mailman about signing for the package, since he had been required to do so in the past. Hanan testified that he heard Samad say "Yes" and then inquire "Sign for you?" No other persons heard the conversation.

of both, Samad took the package and immediately gave it to Hanan. Samad testified that he gave the package to Hanan because he noticed the Pakistani return address and suspected that it might be for Hanan or someone. Hanan knew, because Hanan's family lived in Pakistan, and that he always gave mail from Pakistan to Hanan. Samad then began immediately to watch television. While Samad was watching television, Hanan, in the same room, opened the package. Hanan testified that he was looking for a letter that might identify the addressee of the package. When he picked up the shirt in order to look for the letter, Hanan stated, a plastic bag containing "brown dust" fell out. Hanan claimed that he didn't know what was in the plastic bag, but that he did exclaim "My gosh, what is this?" Samad, according to Hanan's testimony, looked "shocked" but did not say anything. At this point, according to the testimony of both appellants, Samad said that he was cold and went into his bedroom to get a jacket.

After Samad had left the room, the DEA agents knocked on the door; the beeper had sounded, alerting them that the package had been opened. They had a previously obtained search warrant. Hanan testified that after he heard the knock on the door he took the opened package into the kitchen. Noticing that the bag containing the "brown powder" was still on the floor, he kicked it under the rug, he testified, in order to straighten up the room.

Hanan then went to the door and admitted the agents. The agents asked Hanan where the package was, to which Hanan responded "what package?" [7] The agents then saw the package, lying opened, in the kitchen; the shirt was beside the package with the "collar standing up." Special Agent Lee asked Hanan where the plastic bag was, and advised him that the agents were permitted to search the apartment in order to find it. Hanan responded that the bag was under a rug in the living room; the agents found it there and seized it. Samad was not in the living room area when the agents entered, but was later detained and brought into the room.

A further search of the apartment revealed Samad's unsigned application for welfare benefits and a sizable amount of cash. On the welfare application, which was admitted into evidence, no mention was made of any cash assets or employment. The agents also found a letter from the Alexandria welfare department indicating that Samad was receiving monthly assistance. Hanan was found to have $378 on his person and $1700 in a bedroom dresser. In addition, the agents discovered that Samad's suitcase contained $3500; Samad had $850 in a pocket at the time of his arrest.

Samad testified that he brought $4900 to the United States, and that the money found reflected a residuum of that amount.[8] He admitted that he failed to disclose the existence of the money on the welfare forms. He testified that his dual motive for nondisclosure was that he expected to have to pay a large tuition bill and to pay for an expensive medical operation. Samad stated that he kept the money at home because he, like many Afghans, distrusted banks.[9]

Both Samad and Hanan testified that they did not know anyone in the United States named "M. Amin." Although Hanan had family in Pakistan, Samad testified that he had never been there. Both explicitly denied that they had known of the contents of the mailed package.

---

**7.** Hanan admitted that he said "what package," but attributed his question to the "shock" and confusion that occurred when the agents came into the residence.

**8.** Samad testified that his account in West Germany contained $4000 and that the balance of his money was received from the sale of some furniture prior to his move.

**9.** The evidence showed, however, that in West Germany, Samad's employer deposited his paycheck directly into his bank account.

Upon this evidence,[10] the jury found both Samad and Hanan guilty of the importation and possession of heroin.

## II

■ We first address the appellant's respective contentions that the evidence was legally insufficient to convict them of either of the offenses charged. The standard of sufficiency is that there must be "substantial evidence, taking the view most favorable to the Government, to support [the jury verdict]." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■ The offense of importation of a controlled substance into the United States requires proof (1) that the substance was imported; (2) that it was imported knowingly and willfully; and (3) that the defendant willfully associated himself with the importation venture. *See* 21 U.S.C. §§ 952(a), 960; *United States v. Seni,* 662 F.2d 277, 280 (4th Cir.1981). Mere possession of a controlled substance that is of foreign origin is insufficient to establish importation. *See United States v. Moler,* 460 F.2d 1273, 1274 (9th Cir.1972) (per curiam). A critical element of the offense is that the defendant import the substance or cause it to be imported. *See United States v. Koua Thao,* 712 F.2d 369, 371 (8th Cir. 1983).

■ The offense of possession with intent to distribute requires the government to prove beyond a reasonable doubt that the defendant (1) knowingly (2) possessed a controlled substance (3) with the intent to distribute it. *See* 21 U.S.C. § 841(a). Actual possession of the drug is not required; constructive possession, which occurs when the defendant "exercises, or has the power to exercise, dominion and control over the item," *see United States v. Laughman,*

618 F.2d 1067, 1077 (4th Cir.1980), suffices. *See also United States v. Staten,* 581 F.2d 878 (D.C.Cir.1978) (relevant inquiry is whether defendant has "appreciable ability to guide the destiny of the drug"). An individual may possess drugs jointly with another, but mere presence on the premises where drugs are found, or association with one who possesses drugs, is insufficient to establish the possession needed for a conviction under 21 U.S.C. § 841(a). *See Staten,* 581 F.2d at 884. A defendant's intent to distribute the drug may be inferred from the quantity of drugs he possesses. *See United States v. Laughman,* 618 F.2d at 1074 & n. 7.

■ Neither offense of which appellants were convicted can be established by proof merely that a package containing drugs was mailed from outside this country and was received and opened by the addressee of the package who resided in this country. The threat this would pose to innocent victims of mere mistake or actual set-ups is obvious.

The critical fact that the government was required to prove to convict each defendant of the importation charge was that he was expecting the delivery of a package that he knew to contain heroin. If he knew that "M. Amin's" package contained heroin then, inferentially, he was "associated with a venture" to import the drug. From his knowing receipt of such a package, the jury could rationally infer that he had made prior arrangements to have heroin delivered to his address from a point outside the United States. Similarly, if he knew what was in the package when it arrived, the jury could rationally conclude that he thereafter knowingly possessed[11] the substance involved.[12]

10. The government also presented evidence that Samad sent some money to an individual living in West Germany. The trial court also admitted into evidence, for impeachment purposes only, an envelope addressed to Samad from Hanan's brother in Pakistan.

11. It is of course possible for a recipient to possess without having imported. *See United States v. Koua Thao,* 712 F.2d 369, 371 (8th Cir.1983). If Samad, for instance, had not

known of the contents of the package prior to its delivery, but had, after opening it, discovered the heroin and appropriated it for his own use, he would not be guilty of importation but only of possession. Under the facts of this case, it is clear that no such "appropriation" occurred; under the government's theory and on the evidence, Samad could not be found guilty of ei-

The validity of both appellants' convictions for importation and of Samad's for possession with intent to distribute, therefore, depends upon whether the government adduced sufficient evidence to show that he knew that heroin was contained in the package. Although we conclude that sufficient evidence supported the inference that Hanan possessed the requisite knowledge, we hold that the government failed to adduce sufficient proof that Samad received a package that he knew to contain heroin.

### III

The government asserts that Samad's prior knowledge of the package's contents may be inferred from two things: (1) that he "eagerly identified himself as the fictitious addressee" of the package; and (2) that he received welfare assistance while keeping a relatively large sum of cash in his apartment. Taking this as the most favorable factual theory upon which the requisite knowledge could be inferred, we do not think the evidence suffices under the substantial evidence standard.[13]

We look first to the "eager identification" evidence. That can only include the evidence of Samad's general capacity to comprehend spoken English and to speak it understandingly, coupled with the specific evidence of his brief encounter with the mailman. On the first element, the evidence was that he had been in the country for just over a year at the time of his arrest and that his command of the English language was marginal at best. The second element is assertedly established solely by the brief testimony of the mailman, supplemented by two interjections by the trial judge. That critical testimony, in its entirety, went as follows:

Q. What happened when Mr. Samad answered the door?

A. [Letter carrier] I asked for Mr. Amin. He [Samad] said "Yes."

Q. Excuse me.

A. Mr. Amin, the name on the package.

THE COURT: You asked him if he was Amin.

A. I said—

THE COURT: And he said, "Yes"?

A. Yes.

The government contends that the jury could infer from this evidence that Samad falsely represented himself to be the addressee of the package and from that fact infer that he knew that heroin was in the parcel.

■■■ We conclude that a fact-finder could not rationally find beyond a reasonable doubt from this testimony that Samad, in accepting the package, knowingly represented himself to be the fictitious addressee "M. Amin." The only thing, at the most, that this testimony assuredly reveals is that Samad uttered the word "Yes" when presented with a package for a "Mr. Amin,"[14] addressed to the apartment at which he and Hanan resided.

A jury is entitled to make only "reasonable inferences" from the evidence, *See Orrico*, 599 F.2d at 117. We do not believe that it is reasonable to infer beyond a reasonable doubt that Samad, an Afghan who had to speak at trial through an interpreter, purposely misrepresented his identity

---

ther offense if he did not know that heroin was in the package.

**12.** The quantity and quality of heroin found in the pouch provides a sufficient factual basis from which the jury could find the requisite intent to distribute. We therefore reject the argument that, assuming possession, there was insufficient evidence to show intent. *Cf. United States v. Blake*, 484 F.2d 50, 57–58 (8th Cir.1973) (fifteen grams of heroin sufficient to support inference of intent to distribute).

**13.** The government attempted to introduce correspondence that tied Samad to Pakistani contacts, but over vigorous objection, the trial court declined to admit the evidence. The government must per force rely on the evidence of record notwithstanding that the trial judge may have kept relevant evidence from the jury's consideration.

**14.** Notably, the letter carrier did not ask Samad if he was "M. Amin"; nor did Samad sign his name "M. Amin."

by replying "Yes" to a mailman who had thrust a package in his direction with no more of a request for identification than that reflected in this testimony. The government's evidence on this critical element in the chain of inferential proof it relies upon therefore does not suffice under the *Glasser* standard.[15]

■ Nor do we believe that Samad's inquiry to the postman about his need to sign a receipt, and the fact that Samad did not know anyone named "M. Amin," sufficiently tip the rational inference balance. Samad's inquiry, in context, was compatible with any number of innocent hypotheses—most notably, with simple ignorance of postal procedures. As to the evidence that Samad knew no Mr. Amin, there was not, on the other hand, any evidence that at the time he received and immediately turned over the package to Hanan, Samad knew that neither did Hanan know any such person. The inferences the government suggests might be drawn from these items of evidence are simply too attenuated to perform the service.

■ Another item of evidence relied upon by the government is the fact that agents discovered $4350 in cash in the room of Samad, who was then unemployed and receiving welfare assistance. Evidence disclosed that Samad began receiving $70 a month in food stamps and $193 a month rental assistance in late 1981 or early 1982. In addition, another welfare application had been made to Arlington County by Samad or on his behalf. This application, which evidently was not acted upon, failed to disclose the existence of any assets or source of income. The government contends that the possession of $4350 by a man on welfare makes it more likely that the money was obtained illegally. When viewed in conjunction with the other evidence in the record, the government asserts, sufficient evidence exists to support a finding that Samad was a knowing recipient of drugs.

■ Again, we think that this evidence cannot be deemed substantial enough, whether considered alone or in conjunction with other evidence, to support the inference. Bank records admitted into evidence, which were not contradicted by the government, showed that Samad had over $4000 on deposit with a West German bank immediately prior to coming to this country. Samad testified that he brought approximately $4900 to the United States, that his passage was paid for by a local church, and that though he was unemployed at the time of his arrest, he had worked at three different jobs since coming to this country. Samad plainly admitted the fact that he knowingly failed to list his assets when he applied for welfare. While the unexplained possession of a large amount of cash by an individual without any recent income source may be probative of the fact that he has an illegitimate source of funds, the predicate of unexplained possession simply is not present in this case. Even assuming the admissibility of the evidence that Samad falsified his welfare forms—a highly debatable assumption under Fed.R.Evid. 404—that evidence cannot suffice to support the requisite inference here: that Samad was aware that the package contained heroin and, from that, that he imported it. Indeed, by indicating another source of income—albeit one grounded in fraud—the evidence in fact tends to undercut the government's apparent theory that the money on hand must have been obtained by earlier illegal trafficking in other drugs.

In sum, assessing the evidence in the light most favorable to the government with all reasonable inferences drawn in its favor, we do not believe that Samad's con-

---

**15.** We need not reach the reasonableness of the necessary follow-up inference that one who falsely misrepresents his identity as a fictitious addressee in this situation does so because he had knowledge of illicit contents in the package delivered. We address only the prior inference that misrepresentation of identity occurred. In the cases cited by the government on the general point, the defendant's purposeful misidentification was clearly established. *See, e.g., United States v. Richards,* 638 F.2d 765 (5th Cir.1981) (use of false name for post office box); *United States v. Pringle,* 576 F.2d 1114, 1119 (5th Cir. 1978) (use of false name in signing for receipt).

victions can stand. In the end, the evidence came only to this. Samad, an Afghan refugee who had recently moved to this country, accepted a package not addressed to him. In so doing, he responded "Yes" when the mailman stated (not inquired) "for M. Amin," the fictitious addressee of the package. Samad took the package and immediately gave it to a housemate who was the lessee of the premises. Samad did not open the package, nor did he observe Hanan open it. He did not find contraband in a secreted part of the shirt. Indeed while his housemate was opening the package, Samad, on the undisputed evidence, was insouciantly watching television, and left the room after the housemate uncovered what was later determined to be heroin. When the agents came into the apartment they found Samad in another room; Samad had no part in kicking the heroin under the rug or in denying knowledge as to the whereabouts of the just-delivered package.

This evidence is too slim a reed upon which to base a criminal conviction. It unmistakably reveals close physical association, and raises a plausible suspicion of criminal association, with another whose guilt we believe was sufficiently proven. But that obviously does not support a finding of criminal agency. We therefore reverse both of Samad's convictions for insufficiency of the evidence. *See Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

### IV

■■■ As indicated, we conclude that the evidence was, however, sufficient to support the jury's convictions of Hanan on both offenses charged to him. Substantial circumstantial evidence supported an inference that Hanan had prior knowledge of the illicit contents of the package. *See United States v. Tresvant*, 677 F.2d 1018 (4th Cir.1982).

Hanan, unlike Samad, opened a package not addressed to him or to anyone he knew. Although Hanan testified that he was looking for a letter that might identify the proper addressee, the jury was free to conclude otherwise. Second, although Hanan testified that the heroin pouch simply fell out when he lifted the shirt, the jury could reasonably find that Hanan had prior knowledge of the heroin's secreted location. Agent Lee testified that the DEA placed the bag "out of the view of anyone who would open the package without looking for it," and that, upon their entry into the apartment, the agents found "the collar standing up."

The jury could also find that Hanan lied to the DEA agents when asked about the location of the package. Agent Lee testified that Hanan initially denied knowing anything about the parcel, but, upon further inquiry, told the agents where it was. Finally, the jury had before it evidence that Hanan tried to conceal what he claimed to be only "brown powder," by kicking the heroin packet underneath the rug before the agents entered the room. This evidence, relevant only to the government's case against Hanan, was sufficient to present a jury question as to Hanan's guilt. We therefore reject Hanan's assertion that there was insufficient evidence to convict him.[16]

### V

Hanan also contends that he is entitled to a new trial because the prosecutor, during closing argument, referred to a matter not in evidence in an attempt to bolster the credibility of a government witness. Hanan argues that the prosecutor's reference, which the government concedes was improper, compromised his attempt to impeach Agent Lee, a critical government witness.

An important issue at Hanan's trial related to the placement of the plastic bag un-

---

**16.** As earlier noted, *see* note 12, *supra,* we reject Hanan's contention that there was insufficient evidence to show an intent to distribute, given the amount of heroin present in the package before the DEA removed a portion. Similarly, we believe that even after the DEA's removal, the mere "trace" that was left was enough to be "possessed" by Hanan.

der the shirt collar. Since Hanan testified that the bag fell out, it was important for him to show that the bag was positioned in such a way that it might have fallen out, or, in any event, might have been discovered inadvertently by someone without previous knowledge that the pouch was there. Agent Lee, in his affidavit submitted in connection with the government's application for a search warrant, stated that the bag containing heroin was "loosely sewn" back under the shirt collar. On cross-examination, however, Lee stated that the pouch was not resewn but merely placed underneath the collar. Lee's admission, of course, was favorable to Hanan: if the pouch had not been sewn in, it might possibly have fallen out.

In closing argument, defense counsel argued that Lee's affidavit was inconsistent with his trial testimony and urged the jury not to credit the agent's statements. In rebuttal, the prosecutor stated:

> Now, defense counsel has made much about the fact of these comments by Special Agent Lee in the affidavit. Well, I'll tell you something, I'm the one that wrote that affidavit.

Following an objection, the trial judge instructed the jury that the evidence of Lee's prior inconsistent statement could be used to impeach his testimony, but the judge did not specifically instruct the jury to disregard the prosecutor's comments about facts not in evidence.

It is unethical for an attorney to assert his personal knowledge of the facts in issue, unless the attorney is testifying as a witness. *See* Model Code of Professional Responsibility, DR–7–105(c). The "prosecutor may not indicate or imply that information not actually presented to the jury supports a witness's testimony." *See United States v. Gibson*, 690 F.2d 697, 702 (9th Cir.1982) (citing *United States v. Roberts*, 618 F.2d 530 (9th Cir.1980)). The government concedes that the prosecutor's comments were improper and should not have been made, but argues that the remarks did not constitute reversible error.

The prosecutor's overzealous attempt to bolster his own witness was clearly improper and should have been the subject of a curative instruction by the trial judge. But we do not believe that the comments prejudiced Hanan in any significant way. The prosecutor's testimonial comments tended only to support Agent Lee's trial testimony concerning the placement of the bag underneath the collar. Since this testimony favored Hanan's theory of defense, it is difficult to see how he was prejudiced by statements bolstering this testimony.

For the foregoing reasons, we affirm Hanan's convictions.

In No. 83–5090: REVERSED.

In No. 83–5091: AFFIRMED.