842 F.2d 1292
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Orville Wilbert ALLEN, Defendant-Appellant.
 No. 86-5137.
 United States Court of Appeals, Fourth Circuit.
 Submitted Jan. 25, 1988.
Decided March 23, 1988.
 
 Robert Leonard Flax, on brief, for appellant.
 Thomas J. Ashcraft, United States Attorney; David Alan Graham, Assistant United States Attorney; Paul G. Cassell, Assistant Deputy Attorney General, on brief, for appellee.
 Before DONALD RUSSELL, JAMES DICKSON PHILLIPS and WILKINSON, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Orville Wilbert Allen challenges his conviction by a jury on drug trafficking charges. He makes two claims on appeal. First, that certain of the physical evidence used against him was seized in violation of the fourth amendment and should have been suppressed. Second, that even given this evidence, the evidence was insufficient to convict him. We reject both of these claims and affirm.
 
 
 2
 * North Carolina State Bureau of Investigation Agent Jack Davis was on surveillance duty at the Charlotte-Douglas International Airport on the evening of March 12, 1986. At approximately 6:00 p.m., Davis was observing passengers deplaning a flight from Miami, Florida, a known "source" city for narcotics. Davis's attention was drawn to Allen because he met some of the characteristics of the drug courier profile--he was young, casually dressed, and the first person to leave the plane. Allen was wearing fatigue-style pants and carried a briefcase. Davis also noticed a large bulge in Allen's right side pocket, located in the mid-thigh region, that had no particular configuration.
 
 
 3
 Davis overheard Allen ask a flight agent about a connecting flight to Norfolk, Virginia. This further piqued his interest because of his knowledge of increasing drug courier traffic into Norfolk. After Allen had taken a seat in the gate area, Davis asked the flight agent to check Allen's ticket history. This check revealed that Allen was travelling on a one-way ticket from Miami to Norfolk in the name of Carl Ellinggon. The ticket had been purchased in cash earlier that same day and the purchaser had not provided the airline with a call-back number. This information was significant to Davis because he believed that drug couriers typically travel on one-way tickets purchased in cash at the last minute and give a false, or leave no, call-back number.
 
 
 4
 Allen got up from his seat and walked over to an airport gift shop. Davis observed Allen standing in front of the shop window and adjust his position so that he could use the window to determine if he was being followed. At this point Davis, who was dressed in civilian clothes, approached Allen, displayed his credentials, and asked if Allen would speak with him. Allen agreed and Davis asked to see Allen's ticket. Allen asked Davis if he had a warrant, to which Davis responded that he did not. Davis also assured Allen that he was not under arrest and that he was only seeking Allen's cooperation. At this point Allen was visibly nervous.
 
 
 5
 Allen produced his ticket, which was in the name of Carl Ellinggon. Davis returned the ticket and asked Allen for identification, to which Allen responded that he did not have any. Davis then questioned Allen about his trip and his occupation, to which Allen gave conflicting answers. He first claimed that he had been in Miami a week, but quickly changed his answer to a few days. He initially told Davis that he was unemployed, but later claimed to be self-employed.
 
 
 6
 At this point, Davis asked Allen whether he would consent to a search of his person and briefcase. When Allen hesitated, Davis reiterated that he was only seeking Allen's cooperation and that Allen could not be searched without his consent or a warrant, which Davis did not have.
 
 
 7
 Allen agreed to the search, but requested that it be conducted in a private area. After the first location attempted turned out to be occupied by a number of people, the two men went to an enclosed stairway leading down to an airplane parking ramp. As Allen handed his briefcase to Davis, Davis noticed Allen moving his right hand toward his bulging pocket. Davis was alarmed because he thought Allen might have a weapon and asked to "pat down" Allen. As Davis moved to do so, Allen attempted to hit him. Davis blocked the blow and told Allen he was under arrest. A struggle ensued as Allen tried to escape. During an interval where Allen had freed himself, he discarded a paper bag from his bulging pocket. Davis ultimately subdued Allen and retrieved the bag, which contained a white powdery substance Davis believed to be cocaine. Allen was arrested for cocaine trafficking and a search of his person revealed a small container also holding a white powdery substance and a small envelope containing marijuana.
 
 
 8
 Analysis revealed that the bag contained 193.48 grams of 73% pure cocaine. The small container yielded approximately two-tenths of a gram of cocaine. The street value of the 193.48 grams of cocaine was estimated to be from $12,500 to more than $90,000 depending on how it was cut and distributed.
 
 
 9
 Allen was charged with possession of cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1). The district court denied his pre-trial motion to suppress the evidence seized from him and the jury found Allen guilty.
 
 
 10
 This appeal followed.
 
 II
 
 11
 Allen first contends that the encounter with Davis was not consensual, but was a Terry stop, Terry v. Ohio, 392 U.S. 1 (1968), for which there was no reasonable and articulable suspicion. Therefore, he claims that the evidence seized from him as a result of the encounter should have been suppressed.
 
 
 12
 Terry itself teaches that "not all personal intercourse between policemen and citizens involves 'seizures' of persons" so as to implicate the fourth amendment. Id. at 19 n. 16. For example,
 
 
 13
 law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen.... Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.
 
 
 14
 Florida v. Royer, 460 U.S. 491, 497 (1983) (citations omitted). Rather, a fourth amendment seizure occurs "when under the circumstances, a reasonable person would feel that he was not free to leave." United States v. Alpert, 816 F.2d 958, 960 (4th Cir.1987) (citations omitted). The district court, adopting the findings of the magistrate presiding over the suppression hearing, found that the initial encounter between Davis and Allen was consensual. We do not believe that this finding is clearly erroneous. United States v. Aquiar, 825 F.2d 39, 40 (4th Cir.1987).
 
 
 15
 Allen was confronted by a single law enforcement officer dressed in civilian clothes. The entire encounter occurred in a public place, until Allen requested that it be moved to a private location. Davis asked, as opposed to demanding, that Allen speak with him and made no move to impede or detain Allen against his will. Davis explicitly told Allen that he was only seeking Allen's cooperation, that Allen was not under arrest, and that he could not search Allen without his consent or a warrant, which Davis admitted he did not have. At no time did Davis state that he would somehow hold Allen until a warrant were obtained. And though Davis did take possession of Allen's airline ticket to examine it, he quickly returned it to Allen. Other than the fact that Davis identified himself as a law enforcement officer and asked Allen to answer some questions, the record contains no evidence of a showing of force or intimidation by Davis.
 
 
 16
 Even if we were to concede that at some point after the initial approach the encounter became a Terry stop, our decision would be the same. While the fact that Allen met a number of the general characteristics in the drug courier profile alone would not support reasonable and articulable suspicion, Reid v. Georgia, 448 U.S. 438, 440-41 (1980); United States v. Harrison, 667 F.2d 1158, 1161 (4th Cir.1982), there are other suspicious circumstances in this case. Harrison, 667 F.2d at 1161 (drug courier profile characteristics "coupled with other suspicious circumstances may provide the reasonable grounds for suspicion required under the Fourth Amendment").
 
 
 17
 First, Allen did not possess, or at least claimed not to possess, any identification. Common sense dictates that it would be highly unusual for the average traveler not to possess some type of identification. Second, Allen was observed checking the concourse to see if he was being followed. United States v. Corbin, 662 F.2d 1066, 1070 (4th Cir.1981) (combination of drug courier profile characteristics and other suspicious facts, including that defendants "appeared to be trying to determine whether they were under surveillance," provided reasonable suspicion). Third, Allen had a large bulge in a pants pocket that would not normally be expected to be used to carry keys or a wallet or other like objects. United States v. Roundtree, 596 F.2d 672, 674 (5th Cir.1979) (drug courier profile characteristics coupled with "unusual limp" and "very obvious, large bulge on the right inside calf" of the suspect provided reasonable suspicion); cf. United States v. Lehmann, 798 F.2d 692, 694-95 (4th Cir.1986) (combination of drug courier profile characteristics and suspicious bulge beneath pants provided probable cause). Finally, Allen gave inconsistent answers to Davis's simple questions about his trip and occupation.
 
 
 18
 The combination of these facts with the drug courier profile characteristics that Allen exhibited--that he travelled on a flight from Miami, a "source" city for narcotics, to Norfolk, a site of increased drug courier activity, that he used a one-way ticket purchased in cash earlier that same day, that he left no return phone number for the airline, and that he was young, casually dressed and the first to leave the airplane--provided reasonable and articulate suspicion of criminal activity which would have allowed Davis to detain Allen briefly for further questioning had he attempted to leave. Since Allen was not impermissibly seized, his consent to being searched is not infected by an unlawful detention. That consent being otherwise voluntary, the district court was correct to deny Allen's suppression motion.
 
 III
 
 19
 Allen next challenges the sufficiency of the evidence to sustain his conviction. In considering such a challenge, we ask only whether, viewed in the light most favorable to the prosecution, there is substantial evidence to support the verdict. Glasser v. United States, 315 U.S. 60 (1942); United States v. Samad, 754 F.2d 1091, 1096 (4th Cir.1984) (citing Glasser ). Guided by this standard, we believe there is sufficient evidence in the record from which a reasonable jury could find Allen guilty beyond all reasonable doubt.
 
 
 20
 A conviction for possession with intent to distribute a controlled substance under 21 U.S.C. Sec. 841(a)(1) requires proof that the defendant (1) knowingly, (2) possessed a controlled substance, (3) with the intent to distribute it. Samad, 754 F.2d at 1096. Here Allen argues only that the evidence was insufficient to establish the third element of the offense--intent to distribute.
 
 
 21
 In an appropriate case, a defendant's intent to distribute a controlled substance may be inferred from the quantity in possession. An amount reasonably believed too large for the defendant's sole use "justifies the conclusion that possession was for distribution rather than personal consumption." United States v. Mendoza, 722 F.2d 96, 103 (5th Cir.1983); compare United States v. Washington, 586 F.2d 1147, 1153 (7th Cir.1978) ("Proof of possession of a small amount of a controlled substance, standing alone, is an insufficient basis from which an intent to distribute may be inferred." (citation omitted)). The purity and value of the substance, United States v. Prieto-Tejas, 779 F.2d 1098, 1101 (5th Cir.1986) (citation omitted), as well as the manner in which the substance is packaged when seized, cf. Bentley v. Cox, 508 F.Supp. 870, 874-75 (E.D.Va.1981) (Virginia law), are also relevant to the question of whether the defendant had the requisite intent to distribute the substance.
 
 
 22
 A chemistry expert testified that the cocaine seized from Allen weighed 193.48 grams and was of 73% purity. Further testimony indicated that cocaine used for personal consumption is typically packaged in quantities of two-tenths of one gram, or less, and generally ranges in purity from 25-50%. The 193.48 grams would thus yield several thousand of these "typical" packages and was valued at between $12,500 to more than $90,000, depending on how it was packaged for distribution. We believe that this evidence alone would allow the trier of fact to infer that Allen intended the cocaine for distribution. The inference is further supported by the evidence of the small amounts of cocaine and marijuana also seized from Allen. The jury could have concluded that these amounts were for Allen's personal consumption while the larger amount of cocaine was for distribution.
 
 
 23
 Though Allen concedes that there is sufficient evidence to support an inference of intent to distribute the cocaine, he contends that he has introduced sufficient evidence to "rebut" the inference. Allen's rebuttal consisted largely of his own testimony describing his pervasive cocaine use. Allen testified that he was "compulsively" addicted to the drug and received the 193.48 grams as payment for remodeling an office in Florida. He stated that he ingested cocaine by free-basing, a method which requires using large quantities of the drug to prepare a small, highly pure sample for use. In this regard, Allen claimed to be able to consume several grams in the space of a few hours and recounted how he would lock himself inside for three or four days at a time and just consume large quantities of cocaine.
 
 
 24
 The short answer to Allen's rebuttal is that the jury might have simply chosen to disbelieve him, as it was within their prerogative to do. In fact, there is ample evidence in the record that discredits Allen's story. Allen's mother testified that she was not aware of his drug use. This testimony was echoed by his girlfriend, with whom Allen had resided for many years. There was also general evidence of Allen's apparently modest financial position. From this and the other evidence the jury could have concluded that Allen did not use large amounts of cocaine and intended to sell all or part of the 193.48 grams. Alternatively, the jury could have concluded that Allen did have a significant cocaine habit, but that he intended to sell some of the 193.48 grams to help support that habit.
 
 
 25
 AFFIRMED.