**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4906

MOHAMMAD ABDULLAH, a/k/a
Mahmood Abdulla,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CR-98-261-WMN)

Argued: April 7, 2000

Decided: May 26, 2000

Before WILKINS and TRAXLER, Circuit Judges, and
William L. OSTEEN, United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed in part and reversed in part by unpublished per curiam opin-
ion.

_____

**COUNSEL**

**ARGUED:** Paul Victor Jorgensen, Middletown, Maryland, for
Appellant. Robert Reeves Harding, Assistant United States Attorney,
Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia,
United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Mohammad Abdullah appeals his convictions and sentence for possession with the intent to distribute heroin, see 21 U.S.C.A. § 841(a)(1) (West 1999), and for importation of heroin, see 21 U.S.C.A. § 952(a) (West 1999), alleging numerous errors. For the reasons that follow, we reverse the conviction for importation and affirm the conviction for possession with the intent to distribute. Additionally, we reject Abdullah's contention that the district court mistakenly believed that it lacked the authority to depart downward from the applicable sentencing guideline range.

I.

In June 1998, the United States Customs Service in Baltimore, Maryland received information from the Drug Enforcement Administration that heroin would be smuggled into the United States aboard the Pakistani cargo ship Malakand. Customs Service Special Agent Dennis Bass contacted a Pakistani cooperator, Afsar Bahadur, and instructed him to board the Malakand after it docked and attempt to determine whether any of the crew members were attempting to sell heroin. If so, Bahadur was instructed to bring that individual to Bass, who would pose as a potential customer.

After boarding the Malakand, Bahadur met Abdullah, who was the chief steward of the Malakand, and another seaman. Bahadur offered them a ride, and, after dropping the other seaman at a bus station, Bahadur and Abdullah drove around together. The Government and Abdullah give different versions of the facts relating to the interaction between Abdullah and Bahadur.

According to the Government, Abdullah kept changing his mind about where he wanted to be dropped off. As Bahadur and Abdullah

2

were driving around, their conversation turned to drugs. Abdullah asked Bahadur if he knew anyone who wanted to buy heroin. Bahadur said he did know of someone and Abdullah told him that he had two kilograms of heroin hidden in two pairs of sandals on the ship. Bahadur drove to meet Bass, whom Bahadur introduced to Abdullah as his business partner, and while Abdullah made a telephone call, Bahadur relayed to Bass what had transpired. Bahadur and Abdullah arranged to meet later that evening. Abdullah was to bring one kilogram of heroin and Bahadur was to bring $85,000 supplied by Bass. Because Bass did not have the authority to obtain that amount of cash on short notice, he instructed Bahadur to meet with Abdullah and attempt to purchase the heroin on credit. When the two men met, Abdullah was wearing one of the pairs of sandals that contained heroin. When Abdullah refused to sell the heroin on credit, Bahadur, at Bass' further instruction, arranged for Abdullah and Bass to meet. When that meeting took place, Bass tested a sample of the heroin and gave a prearranged signal, at which point waiting officers arrested Abdullah.

According to his trial testimony, Abdullah accepted a ride with Bahadur because he needed to find a telephone to call his wife. Bahadur took Abdullah to meet Bass, who allowed Abdullah to use his cellular telephone. Bahadur then drove Abdullah back to the Malakand, stopping at a restaurant for sandwiches. On the drive back to the ship, Bahadur told Abdullah that Bass was his business partner and wanted to buy heroin. Abdullah denied any knowledge of drugs. Bahadur accompanied Abdullah onto the ship. Although Abdullah knew nothing about heroin, he had seen two pairs of sandals outside the storage area of the ship earlier that day, and Abdullah offered these to Bahadur, since Bahadur had bought a meal for him. Bahadur talked Abdullah into putting them on and accompanying him to his automobile. Bahadur insisted that he wanted to pay Abdullah for the sandals and that Bass had money. The two men drove together to find Bass. During the drive, Bahadur revealed to Abdullah that the sandals contained heroin. Abdullah tried to discourage Bahadur from involving him in an apparent drug transaction. Bahadur and Abdullah met Bass, who opened the sandals to remove the heroin, and the police converged on the men.

3

At trial, defense counsel mentioned during opening argument that the Government had "trapped" Abdullah. After the presentation of all of the evidence, defense counsel requested an entrapment instruction. The district court refused to give the instruction and, instead, gave an "anti-entrapment" instruction.[1]

Before the jury retired for deliberation, the district court instructed it on the meaning of "importation" as follows:"`Importation' for the purposes of this statute, has the ordinary meaning of bringing drugs into the country from outside the country. The drugs need not pass through customs or pass by the customs authorities in entering the United States in order to come within the purview of the statute." J.A. 424. During its deliberations, the jury sent a note to the judge posing the following questions: "With Importation to the U.S. is the Ship a

———————————————————————————————

[1] The "anti-entrapment" instruction given by the district court was as follows:

> There was mention in defense counsel's opening statement that the evidence would indicate that the defendant was trapped in a scheme involving others. In order to avoid any confusion with what is often referred to as a defense of "entrapment," let me explain to you briefly what the notion of entrapment is. While the law permits government agents to trap an unwary criminally minded person, the law does not permit the government agents to entrap an unwary innocent. That means a defendant may not be convicted of a crime if it was the government who gave the defendant the idea to commit the crime, it was the government who also persuaded him to commit the crime, and if he was not ready and willing to commit the crime before the government officials or agents spoke with him.

> On the other hand, if the defendant was ready and willing to violate the law, and the government merely presented him with an opportunity to do so, that would not constitute entrapment.

> After reviewing the evidence presented at trial, I have concluded that no defense of entrapment has been raised. You, therefore, should ignore any suggestion or concept that may have been raised in your mind that entrapment might be an issue. The question of the guilt or innocence of the defendant does not turn on issues of entrapment.

J.A. 416.

4

foreign country? And, does Importation to the U.S. begin From the Home Country to the U.S. port or From the Foreign Country's Ship to the U.S. port?" Id. at 444. After conferring with counsel, the court gave the following supplemental instruction:

> In response to your question about importation, you will find a simple definition of importation on page 26 of my instructions.
>
> You need not determine that the drugs were brought into this country from another specified country but only that they were brought into this country by the defendant from some place outside of this country or that the defendant aided or abetted another in bringing the drugs into this country from a place outside of this country.

Id. at 445.[2] The jury convicted Abdullah of both counts.

At a subsequent sentencing hearing, the district court overruled Abdullah's objections to the presentence report.[3] After finding that the

_____

[2] The district court rejected the following request made by defense counsel:

> [M]y proposal would be that we just elaborate on the instruction Your Honor has already drafted by adding one or more paragraphs to it.... Perhaps we can have a third paragraph indicating that the ship, if their reference is to the ship being docked at the Port of Baltimore or within the territorial waters of the United States, then a ship is not a foreign country, and that, I believe, would answer the first inquiry that the jury is addressing.
>
> The second inquiry would be that importation begins from any place outside the territorial limits of the United States into the territorial limits of the United States. With respect to the territorial limits of the United States in the waters surrounding the United States, the jurisdiction and the territorial limits of the United States extend 12 miles into the ocean.

J.A. at 392-93.
[3] Defense counsel objected to a two-level enhancement for obstruction of justice, see U.S. Sentencing Guidelines Manual § 3C1.1 (1998), and argued for an adjustment of the base offense level for acceptance of responsibility, see id. § 3E1.1.

guideline range was 151-188 months and receiving recommendations from the Government and defense counsel regarding the appropriate sentence, the district court provided Abdullah with an opportunity to address the court. During his allocution, Abdullah begged for mercy, pleading, inter alia, that he was old, that he was in poor health, and that he had young children with no one to look after them. Abdullah asked the court to sentence him to five years; additionally, he begged the court to send him home. During Abdullah's allocution, the district court stated, inter alia, "I do not have the authority to impose any sentence less than the 151 months that is required by the sentencing guidelines," id. at 462, and "I do not have any authority to do anything other than impose a sentence between 151 months or 188 months," id. at 463. The court sentenced Abdullah to 151 months imprisonment.

Abdullah now appeals, maintaining that the district court erred in refusing to give an entrapment instruction and in giving the "anti-entrapment" instruction; that the supplemental instruction to the jury regarding importation was inadequate and mandates reversal; and that the court mistakenly believed that it did not have the authority to depart downward based on Abdullah's statements during allocution. We address these arguments seriatim.

II.

A.

Abdullah first contends that the district court erred in refusing to instruct the jury on entrapment. We review de novo the refusal by the district court to give an entrapment instruction. See United States v. Phan, 121 F.3d 149, 154 (4th Cir. 1997). In order to establish entitlement to an entrapment instruction, the defendant must present evidence that the Government induced him to commit the crime and that he had no predisposition to engage in criminal conduct. See id. at 153-54. Evidence that the Government solicited the crime is not adequate to show inducement; rather the defendant must produce evidence of "excessive behavior on the part of the government that could be said to be so inducive to a reasonably firm person as likely to displace mens rea." United States v. DeVore, 423 F.2d 1069, 1071-72 (4th Cir. 1970); see United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995)

6

(explaining that "inducement consists of opportunity plus something like excessive pressure or manipulation of a non-criminal motive").

Abdullah argues that Government inducement was shown by evidence that Bahadur spent a substantial amount of time with Abdullah, bought food for him, and tried to arrange a heroin transaction with him despite Abdullah's disavowal of any knowledge of heroin. We conclude that no reasonable jury would find that this evidence demonstrates the excessive behavior on the part of the Government necessary to entitle Abdullah to an entrapment instruction.

B.

Next, Abdullah contends that the district court erred in giving the "anti-entrapment" instruction. We review the decision of the district court regarding whether to give a jury instruction, as well as the content of an instruction, for abuse of discretion. See United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996). Because defense counsel had stated in his opening argument that Abdullah was "trapped" by the Government, and because "entrapment" is not necessarily understood in its legal sense, the district court determined that an instruction was necessary to prevent the possibility that the jury would improperly conclude that Abdullah had been entrapped. This decision by the district court was not an abuse of discretion.

Abdullah maintains that the "anti-entrapment" instruction violated due process because it allowed the jury to convict him without the requisite proof of intent. Specifically, Abdullah asserts that the instruction "established a criminal predisposition by Abdullah to perform the acts with which he was charged, thus directing a verdict on the primary element controverted by Abdullah's testimony, that of intent." Brief for Appellant at 15; see Carella v. California, 491 U.S. 263, 265 (1989) (per curiam) (noting that a jury instruction that relieves the prosecution of its burden to prove every element of the offense beyond a reasonable doubt violates due process). We disagree.

The instruction did not by its terms direct the jury to find that Abdullah had the requisite intent. Accordingly, the question becomes whether there is a reasonable likelihood that the jury applied the

7

instruction in an unconstitutional manner. See Kornahrens v. Evatt, 66 F.3d 1350, 1363 (4th Cir. 1995). We conclude that there is no such likelihood here. The instruction given by the district court simply informed the jury that entrapment was not an issue in the case; it in no way directed, or even suggested, a particular finding on the issue of intent.

III.

Abdullah next contends that the district court erred in refusing to give his requested supplemental instruction in response to the questions from the jury regarding importation. We agree that the district court erred in its response to the questions from the jury and that the error mandates reversal of Abdullah's conviction on the importation count.

When reviewing a challenged supplemental instruction, "we inquire whether the supplemental instruction fairly responded to the jury's question without creating prejudice." United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1407 (4th Cir. 1993). An error in a supplemental instruction mandates reversal "only if the error is determined to have been prejudicial, based on a review of the record as a whole." Id. at 1406 (internal quotation marks omitted).

In order to convict Abdullah of the importation offense, the Government was required to prove beyond a reasonable doubt that he knowingly and willfully "import[ed] into the United States from any place outside thereof" a controlled substance. 21 U.S.C.A. § 952(a); see United States v. Samad, 754 F.2d 1091, 1096 (4th Cir. 1984). Of relevance here, the boundary determining what is "outside" the United States is 12 miles from the coast. See United States v. Seni, 662 F.2d 277, 286 (4th Cir. 1981). Thus, the Government had to prove more than that Abdullah brought the heroin from the ship, while it was docked in Baltimore harbor, into the port. Additionally, the Government could not meet its burden by proving only that Abdullah learned at some point while the ship was already in territorial waters of the United States that the sandals contained heroin and then decided to bring the heroin into Baltimore to sell it. Rather, the Government was required to prove that Abdullah brought the heroin into Baltimore and either that Abdullah brought the heroin onto the ship from a foreign

8

country or that he took control of the heroin while the ship was outside the territorial waters of the United States.

The questions from the jury indicate that it was unsure about what it was required to find regarding when Abdullah's involvement with the heroin began. It appears from the questions that the jury may have (incorrectly) equated "outside" the United States with a foreign vessel; thus, the jury was questioning whether it needed to trace Abdullah's involvement back merely to the ship (even though it was docked in American waters), or back to a foreign country. The instruction proposed by the defense was a correct statement of the law and would have addressed this confusion by clarifying that the jury needed to trace Abdullah's involvement to some point outside the territorial limits of the United States.

The supplemental instruction given by the district court, however, did not fairly respond to the questions posed by the jury. The district court instructed the jury that it need not determine that Abdullah imported the heroin from a specified country, but only that Abdullah must have brought the heroin from outside the United States. While this instruction was correct, it was insufficient to respond to the questions posed by the jury because it failed to inform the jury of the meaning of "outside" the United States. There is no reason to expect a juror to know when someone traveling by ship has entered the United States. Because the instruction may well have left the jury with the false impression that a foreign ship was"outside" the country,[4]

_____

[4] The Government argues that the jury would not have convicted Abdullah if it believed his story because the jury would know that a ship docked in Baltimore, regardless of whether it is foreign or domestic, is not a place outside the United States. We disagree. We do not find it inconceivable that a jury of lay persons could believe Abdullah's story but convict on the belief that a Pakistani ship, although docked in a United States port, is a "foreign country" and thus is outside the United States. Moreover, the jury could disbelieve Abdullah's story without necessarily accepting the Government's theory of the events. Thus, although the jury may have disbelieved Abdullah's story, it may have been unable to conclude beyond a reasonable doubt that Abdullah was responsible for bringing the heroin onto the ship in Pakistan or some other foreign port. In that case, it was crucial that the jury determine when Abdullah's involvement with the heroin began--specifically, whether Abdullah became involved before the ship came within the territorial waters of the United States.

9

it allowed the jury to convict upon finding that Abdullah brought the heroin into Baltimore from the ship without finding that Abdullah was responsible for bringing the heroin into the territorial waters of the United States. Thus, the supplemental instruction was both inadequate and prejudicial to Abdullah. See United States v. Nunez, 889 F.2d 1564, 1568-70 (6th Cir. 1989) (holding that supplemental instruction that failed to clarify important legal issue constituted prejudicial error). We therefore reverse Abdullah's conviction on the importation count and remand with instructions for the district court to amend the judgment accordingly.

IV.

Finally, Abdullah contends that he is entitled to be resentenced because the district court mistakenly believed that it lacked the authority to depart downward. If a district court refuses to grant a departure because of a mistaken belief that it lacks discretion to do so, we are required to vacate and remand for the district court to con-sider the exercise of its discretion. See United States v. Brock, 108 F.3d 31, 33-35 (4th Cir. 1997).

Abdullah argues that the statements he made during his allocution constituted a request for a downward departure on the basis of five factors: his advanced age; his poor health; his deportable status as an alien; his family's dependency on him; and his diminished capacity. We disagree. Abdullah's allocution took place after the district court had already overruled defense counsel's objections to the presentence report and determined the appropriate guideline range. Under the cir-cumstances, Abdullah's allocution must be construed as a plea for mercy rather than as a request for a downward departure. And, even if Abdullah was requesting a downward departure, read in its proper context, the district court was merely responding that since no legiti-mate basis existed to justify a downward departure, the sentence was required to be within the previously determined guideline range.

V.

In sum, we hold that the district court erred in its supplemental instruction to the jury regarding the importation offense and that this error was prejudicial to Abdullah. We therefore reverse Abdullah's

conviction on the importation offense. We affirm as to all other allegations of error.**5**

<u>AFFIRMED IN PART AND REVERSED IN PART</u>

_____

**5** Abdullah also contends that the district court erred in denying his motion to suppress incriminating statements he made following his arrest. Having carefully considered this allegation of error, we conclude that it is without merit.

11