STATE of Utah, Plaintiff and Appellee,

v.

Foster LEONARD, Defendant
and Appellant.

No. 900560–CA.

Court of Appeals of Utah.

Dec. 5, 1991.

Jay Fitt, Orem, for defendant and appellant.

R. Paul Van Dam and Marian Decker, Salt Lake City, for plaintiff and appellee.

Before JACKSON, ORME and RUSSON, JJ.

## OPINION

JACKSON, Judge:

Defendant Foster Leonard appeals from his conviction for possession of equipment with intent to manufacture a controlled substance, a third degree felony, in violation of Utah Code Ann. § 58–37C–8 (1990), and for conspiracy to manufacture a controlled substance, a third degree felony, in violation of Utah Code Ann. §§ 76–4–201 (1990) and 58–37–8 (1990). We affirm.

## BACKGROUND

From approximately May 1, 1989, to when the present facts occurred, law enforcement agencies had been conducting surveillance at Intertech Chemical in Orem, Utah. The surveillance had resulted in several arrests and convictions relating to the possession and manufacture of controlled substances, specifically methamphetamine. On July 20, 1989, Police Officer Terry Fox was conducting surveillance at Intertech. He noticed defendant and April Garza in the parking lot. Both were dressed in clothing "not typical of business [people]," and looked nervous. Defendant went into Intertech and came out carrying a box of what appeared to be glassware and chemicals. Defendant loaded the box into a Ford Bronco, and drove away from the parking lot with Garza. Fox decided to follow the vehicle in order to identify its owner.

As Fox proceeded out of the parking lot in his unmarked vehicle, a Datsun truck swerved in front of him. Fox testified that he thought the driver of the Datsun was trying to block him from pursuing defendant's vehicle. Fox continued to follow defendant, who drove recklessly onto the freeway. Defendant's vehicle accelerated to over seventy miles per hour and made several illegal lane changes, according to Fox. Fox also observed defendant putting bandanna-type flags out both windows of the Bronco, apparently to signal the occupants of the Datsun. Fox attempted to find out who owned the vehicle he was pursuing, but the police dispatcher found no owner registered for the license plates on defendant's vehicle. The Datsun similarly had no registered owner.

Fox testified that he decided to stop defendant for the traffic violations he had witnessed. Thinking that he might be in danger, Fox called for assistance. Three other police officers eventually assisted Fox in stopping defendant. One of those, Detective Gary Caldwell, learned from Intertech that defendant and his companion had purchased glassware and a chemical. None of the items purchased were controlled substances, but all were commonly used in the manufacture of methamphet-amine. Caldwell testified that he made the decision to stop the vehicle based on his belief that defendant was in possession of drug paraphernalia and controlled substances.

When defendant's vehicle was pulled over, the officers had defendant and Garza get out of the vehicle and kneel down on the side of the freeway. Under Caldwell's direction, Officer Sean Greening placed Garza in his vehicle and asked her name, address, and birthdate. Garza produced an Oregon driver's license. Greening testified that he also advised Garza she did not have to answer his questions. Garza asked why she was being stopped, to which Greening replied "for possession of drug paraphernalia." Garza then explained to Greening that someone had paid her and defendant to purchase the items, and that they were to deliver the items to a motel room.

Meanwhile, Caldwell asked defendant for a driver's license and vehicle registration. Defendant had no identification and told Caldwell the vehicle belonged to Garza. Defendant then gave Caldwell the name "Scott Leonard" and a birthdate which was later determined to be false. Caldwell testified he advised defendant of his constitutional rights and defendant consented to answering some questions. Caldwell then proceeded to question defendant as to what he was doing in Utah County. Defendant told Caldwell that he had come to Utah County to purchase the items for someone, and that he could not tell Caldwell who that was, because defendant would get in trouble. Caldwell also testified that he could see a box in the back of the Bronco, and that the box contained the items Intertech had told him defendant had purchased.

Because the stories given by defendant and Garza were different, and because he knew what items defendant had purchased at Intertech, Caldwell arrested defendant and Garza. Defendant and Garza were transported to the American Fork Police Department and both were questioned by Caldwell. Eventually Caldwell determined the exact address of the apartment which defendant and Garza shared, and a search

warrant of the premises was obtained, based on Caldwell's affidavit.

Defendant moved to suppress the evidence found in the warrantless search of the Bronco and in the warrant search of his apartment, claiming that the officers did not have probable cause to initiate the stop of his vehicle. The trial court denied his motion. Defendant then entered a conditional plea of guilty pursuant to this court's decision in *State v. Sery*, 758 P.2d 935, 938 (Utah App.1988), and this appeal followed.

Before this court, defendant appeals the denial of his motion to suppress, claiming that the evidence was illegally obtained. Specifically, defendant claims that his arrest was not based on probable cause; that the search of the Bronco was not based on probable cause; and that the search of his residence was tainted by the illegality of the arrest.

## STANDARD OF REVIEW

◼ Our review of findings of fact underlying a trial court's decision on a motion to suppress is governed by the "clearly erroneous" standard, *State v. Grovier*, 808 P.2d 133, 133 (Utah App.1991), because the trial court is in an advantageous position to determine the factual basis underlying such a motion. "The trial court's finding is clearly erroneous only if it is against the clear weight of the evidence...." *State v. Sery*, 758 P.2d 935, 942 (Utah App.1988).

1. The Fourth Amendment to the United States Constitution provides, with our emphasis:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, *but upon probable cause,* supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

2. Of course, no suspicion is required when a police officer merely makes an inquiry of an individual in the context of a wholly voluntary encounter. The Utah Supreme Court has determined that there are three levels of police-citizen encounters, each of which requires a different degree of justification to be constitutionally permissible:

## LEGALITY OF THE INITIAL STOP

◼ The Fourth Amendment to the United States Constitution requires that all seizures of an individual be based on probable cause.[1] The United States Supreme Court first explicitly permitted a seizure of an individual upon less than probable cause in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The *Terry* Court held that a police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21, 88 S.Ct. at 1880. The reasonable suspicion standard is codified at Utah Code Ann. § 77–7–15 (1990):

A peace officer may stop any person in a public place when he has a reasonable suspicion to believe he has committed or is in the act of committing or attempting to commit a public offense and may demand his name, address and an explanation of his actions.

"Stressing that each case must be decided upon its own facts, the *Terry* court concluded that the limited stop and frisk was justified where 'a police officer observes unusual conduct which leads him reasonably to conclude in light of his [or her] experience that criminal activity is afoot....'" *State v. Sery*, 758 P.2d 935, 941 (Utah App.1988) (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884). Thus, a temporary detention or seizure is justified when there is an articulable suspicion that an individual has committed or is about to commit a crime.[2] *See id.* (quoting *Florida*

(1) an officer may approach a citizen at anytime [sic] and pose questions so long as the citizen is not detained against his will;
(2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop";
(3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed.
*State v. Deitman*, 739 P.2d 616, 617–18 (Utah 1987) (per curiam) (quoting *United States v. Merritt*, 736 F.2d 223, 230 (5th Cir.1984)). "The stopping of a vehicle and the consequent detention of its occupants constitute a level two 'seizure' within the meaning of the fourth amend-

*v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion)). This court has further refined the *Terry* reasonable suspicion test, concluding that a "brief investigatory stop must be based on 'objective facts' that the 'individual is involved in criminal activity.'" *State v. Holmes,* 774 P.2d 506, 508 (Utah App. 1989) (citations omitted).

The State argues that several facts support the conclusion that the officers in the present case had a reasonable suspicion that criminal activity was afoot, and that therefore the stop of defendant was justified. Intertech had been under surveillance for selling drug paraphernalia; defendant's behavior was suspiciously inconsistent with that of a legitimate businessman; defendant purchased several items from Intertech which are commonly used in the manufacture of methamphetamine; defendant left Intertech in an unregistered vehicle; some person in a Datsun tried to prevent the officers from pursuing defendant; defendant displayed bandannas from the windows of his vehicle in an apparent attempt to signal the occupants of the Datsun; and defendant drove erratically and illegally on the freeway, apparently engaging in evasive tactics.[3]

■ We agree that there was an articulable suspicion which justified the stop of defendant's vehicle, and that therefore the level two seizure of defendant was reasonable.[4] While defendant contends that the officers had no evidence that a crime had been committed, we note that the officers were not only entitled, but probably required, to obtain more information when they reasonably suspected a crime had been committed. *See State v. Folkes,* 565 P.2d 1125, 1127 (Utah), *cert. denied,* 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed.2d 461 (1977); *Holmes,* 774 P.2d at 508. We hold, therefore, that defendant was constitutionally stopped and briefly detained, and that the trial court's determination that the requisite reasonable suspicion existed was not clearly erroneous.

## ARREST OF DEFENDANT AND SEARCH OF VEHICLE

Having determined that the initial seizure of defendant was lawful, we must determine if the subsequent arrest and search were lawful. Defendant argues that the police officers lacked probable cause to arrest him, or to conduct a warrantless search of the vehicle in which he was riding. The trial court found that the arrest of defendant was based on probable cause because the chemicals and equipment found in the vehicle were commonly used together in the manufacture of methamphetamine, and because testimony revealed that only one specialized piece of glassware and some chemicals were lacking to make the illegal substance. As to the search of defendant's vehicle,[5] the trial court found that there was probable cause based on the list of items purchased from Intertech received while the officers were in pursuit, the suspicious behavior of defendant, and "all attendant circumstances."[6] However,

---

ment, even if the purpose of the stop is limited and the resulting detention brief." *State v. Steward,* 806 P.2d 213, 215 (Utah App.1991) (citing *State v. Sierra,* 754 P.2d 972, 975 (Utah App.1988)). In our case, it is not disputed that a level two stop occurred.

3. The State also lists as support for the contention that the stop of defendant was based on a reasonable suspicion, several facts which occurred *after* defendant had been stopped. Of course, only facts known to the officers *at the time they stopped defendant's vehicle* are relevant. *See State v. Baird,* 763 P.2d 1214, 1217 (Utah App.1988). *See also State v. Mendoza,* 748 P.2d 181, 183 (Utah 1987).

4. While Fox testified that he originally planned to stop defendant for traffic violations, it is clear from the record that Caldwell, who took charge of the situation once he was contacted by Fox, stopped defendant's vehicle for the purpose of ascertaining who defendant was, and for what purpose the glassware and chemicals had been purchased from Intertech.

5. We refer to the vehicle which defendant was driving as "defendant's vehicle," but we note that the vehicle actually belonged to passenger Garza.

6. The State does not argue that defendant, because he was not the owner of the vehicle, has no standing to challenge the search of the vehicle. Therefore, we do not reach the question of whether defendant had a legitimate expectation of privacy in the vehicle.

Prior to *State v. Schlosser,* 774 P.2d 1132 (Utah 1989), our supreme court never required

the court's ruling does not indicate which exception to the warrant requirement of the Fourth Amendment it was relying upon in justifying the warrantless search.

### The Arrest

■ As to the legality of the arrest, Utah Code Ann. § 77-7-2 (1990) provides authority for peace officers to make an arrest with or without a warrant. Reasonable cause for arrest without a warrant was defined by the Utah Supreme Court in *State v. Hatcher*, 27 Utah 2d 318, 495 P.2d 1259 (1972): "The determination should be made on an objective standard: whether from the facts known to the officer, and the inferences which fairly might be drawn therefrom, a reasonable and prudent person in his position would be justified in believing that the suspect had committed the offense." *Id.* at 1260 (citations omitted). *See also State v. Ayala*, 762 P.2d 1107, 1111 (Utah App.1988), *cert. denied*, 773 P.2d 45 (Utah 1989).

■ The arresting officer, Caldwell, testified that he questioned defendant regarding his presence in Utah County and the purchase from Intertech. Only after defendant gave a false name and birthdate, could provide no plausible explanation for the purchase, and would not tell Caldwell who had paid him to make the purchase, did Caldwell effectuate an arrest.

These facts, taken together with the evasive tactics engaged in by defendant when the officers were pursuing him, the fact that the officers knew exactly what defendant had purchased from Intertech based on the list of items received while in pursuit, and the fact that the items found in defendant's vehicle were commonly used together in the manufacture of methamphetamine, warranted arresting defendant. Accordingly, we cannot say that the trial court's finding of probable cause was an erroneous one.

■ The dissent takes issue with the tactics employed by the officers in effectuating a level two stop, concluding that a de facto arrest actually occurred. Admittedly, if defendant had been arrested immediately upon being stopped by the officers, probable cause would have to be established at that point, and not after Caldwell interviewed defendant. While many courts have addressed the issue of when a seizure occurs,[7] the cases are less clear on when an arrest occurs. The United States Supreme Court has acknowledged that it is sometimes difficult to distinguish an investigative stop from a de facto arrest. *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). There is no "litmus-paper test for ... determining when a seizure exceeds the bounds of an investigative stop[,]" *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983), and becomes an arrest. Rather, the determination usually depends upon the reasonableness of the stop under the circumstances. Two factors, whether there was a proper basis for the stop, and whether the degree of

---

the issue of standing to be raised by the parties in the trial court or on appeal. "Standing is an issue that a court can raise *sua sponte* at any time." *State v. Tuttle*, 780 P.2d 1203, 1207 (Utah 1989), *cert. denied*, 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990). Rather, that court reached the issue regardless of whether or not a party had raised it. *See State v. Constantino*, 732 P.2d 125, 126–27 (Utah 1987) (per curiam); *State v. Valdez*, 689 P.2d 1334, 1335 (Utah 1984); *State v. Purcell*, 586 P.2d 441, 443 (Utah 1978). In *Schlosser*, however, the court held that standing to challenge the validity of a search is not a jurisdictional doctrine, and, as such, that issue is waived if not raised before the trial court by the parties. *Schlosser*, 774 P.2d at 1138–39. *But see Schlosser*, 774 P.2d at 1139–41 (Howe, J., dissenting) (two justices would *sua sponte* raise issue of standing).

7. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). *See also Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984) (intimidating circumstances surrounding police questioning result in Fourth Amendment seizure); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (person is seized when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave").

intrusion was reasonably related to the facts and circumstances at hand, are determinative of reasonableness. *Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1878–79; *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir.1986), *cert. denied*, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987). While the dissent does not dispute there was a reasonable basis for the stop, it does take issue with tactics employed by the officers. In reaching our conclusion that a proper level two stop was effectuated in this case, a review of cases which have addressed this question is useful to illustrate that no arrest took place.

■ The dissent is correct in acknowledging one exception to the general proscription against intrusive police conduct: police are permitted to use a show of force or other exceptional methods during a *Terry* stop when such measures are reasonably necessary for the protection and safety of the investigating officers. The mere use or display of force in making a stop will not necessarily convert a stop into an arrest. *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986); *United States v. White*, 648 F.2d 29, 34 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981). *See also Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (police officers making a reasonable investigatory stop should not be denied the opportunity to protect themselves from possible

attack); *United States v. Lego*, 855 F.2d 542, 545 (8th Cir.1988) (officer can point a gun at suspect without transforming investigative stop into arrest); *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir.) (because "officer suspected appellant of dealing in narcotics, a pattern of criminal conduct rife with deadly weapons," display of weapon justified), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *United States v. Eisenberg*, 807 F.2d 1446, 1451 (8th Cir.1986) (experienced police officers acted reasonably in drawing weapons in investigative stop of suspected narcotics dealer).

■ We recognize that the officers' conduct, ordering defendant to kneel at the side of the road, was intrusive.[8] If weapons were drawn, the conduct is even more intrusive.[9] Certainly such conduct would not be warranted if the surrounding circumstances did not give rise to a justifiable fear for personal safety. *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir.1986). However in this case, there was justification. While the dissent acknowledges that certain situations merit officers approaching a suspect with their weapons drawn, or ordering a suspect to lie on the ground, the dissent argues that in this case, such actions were not warranted because the police never determined whether defendant had a weapon, and there was no indication that defendant was dangerous. However, that conclusion is based on faulty assumptions.

---

**8.** Focusing on whether or not requiring a driver to step out of his or her vehicle exceeds the scope of a *Terry* stop, the Supreme Court has concluded that "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). *See also United States v. Lego*, 855 F.2d 542, 545 (8th Cir.1988) (officer's confining suspect in police car within scope of investigative stop); *United States v. Manbeck*, 744 F.2d 360, 377–78 (4th Cir.1984) (upholding reasonableness of investigative stop where police ordered the suspect to take a seat in the police car), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). Also, as the dissent points out, police may require a suspect to lie on the ground. *See, e.g., United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987).

**9.** There is nothing in the record that supports the dissent's conclusion that defendant was not violent or armed. In fact, quite the opposite can be assumed given the facts recited above. On similar facts, the Ninth Circuit Court of Appeals held that it was reasonable to assume that a suspected narcotics dealer was armed and dangerous. *United States v. Salas*, 879 F.2d 530, 535 (9th Cir.) (erratic and evasive driving by defendants and reports of drug materials in defendants' motel room gave police reasonable suspicion that defendants were armed), *cert. denied*, 493 U.S. 979, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989); *see also United States v. Post*, 607 F.2d 847, 851 (9th Cir.1979) ("[i]t is not unreasonable to assume that a dealer in narcotics might be armed").

First, the record does not indicate whether or not defendant was frisked. Two of the officers who testified gave different accounts of what transpired after defendant's vehicle was stopped.

Second, the record *does* indicate that the officers thought defendant was dangerous and could be carrying a weapon. Officer Fox testified that he became fearful when bandannas were put outside the windows of defendant's car. He decided to call for back-up officers to stop defendant's car when the bandannas appeared, and when he saw the cream-colored Datsun following him. "I felt it was a chase car, an assistance car," Fox testified, "and I was again fearful that I needed to have enough help to stop this vehicle so I wouldn't get hurt." In addition, Fox stated that when he sees an unregistered vehicle, he immediately gives it more caution. Officer Greening, who also testified at the suppression hearing, stated that he was called to assist in a stop for drug paraphernalia, and that he has been informed in past circumstances that "these people could be dangerous, and thats why [he] was there to assist." Greening went on to say that officers, including himself, were often called to assist on DUI's and regular traffic stops, and "whenever an officer may feel he is in danger," and that it was his belief in dealing with people who were involved with drugs that "[t]hey have been convicted criminals and in the possession of firearms." We find abundant support in the record that the officers believed defendant could be armed or dangerous, and not, as the dissent suggests, that the police had nothing more than a hunch that defendant might be dangerous. Therefore, the officers' actions were not unreasonable to insure their safety.

The dissent points to defendant's being read his *Miranda* rights as further indication that an arrest took place. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that *Miranda* warnings were not required when a defendant is subjected to questioning during a routine traffic stop. The Court pointed to the circumstances around a traffic stop and compared them to stationhouse interrogation, "which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Id.* at 448, 104 S.Ct. at 3149 (citations omitted). Given that traffic stops occur in public, and that they are relatively brief, the Court concluded that "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*" *Id.* 468 U.S. at 440, 104 S.Ct. at 3150. The Court, however, also noted that police "could ensure compliance with the law by giving the full *Miranda* warnings." *Id.* at 431 n. 13, 104 S.Ct. at 3145–46 n. 13.[10] That is exactly what took place here.

In the present case, defendant was detained briefly on the side of the highway. The officers interrogated defendant. Defendant was arrested after he gave the officers false information, and had no plausible explanation for the Intertech purchase. Given the circumstances facing the officers, we conclude that they pursued their investigation in a diligent and reasonable manner, and that the methods employed were not excessive.

### The Search

Admittedly, a search conducted without a warrant is unreasonable per se unless it falls within a recognized exception

---

**10.** In *United States v. Bautista*, 684 F.2d 1286 (9th Cir.1982), the Ninth Circuit Court of Appeals held that while officers are not required to give *Miranda* warnings every time they question a suspect, "*Miranda* warnings are necessary even during a *Terry* stop if the suspect has been taken into custody or if the questioning takes place in a police dominated or compelling atmosphere." *Id.* at 1291 (citing *United States v. Wilson*, 666 F.2d 1241, 1247 (9th Cir.1982); *United States v. Harris*, 611 F.2d 170, 172 (6th Cir.1979)); *United States v. Hickman*, 523 F.2d 323, 327 (9th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976). *Compare United States v. Baron*, 860 F.2d 911, 914 (9th Cir.1988) (police exceeded scope of investigative stop by ordering defendant not to touch anything or say anything, and thirty-five minutes later confined her to a small room for questioning), *cert. denied*, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989).

to the warrant requirement. *See State v. Bartley*, 784 P.2d 1231, 1235 (Utah App. 1989). The State, acknowledging that the trial court did not rely upon a specific exception, claims that the search was justified pursuant to the automobile exception.

In *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court determined that a warrantless search of an automobile was permissible if the officers have probable cause to believe the automobile contains either contraband or evidence of a crime and that they may be lost if not immediately seized. *Id.* at 151–52, 45 S.Ct. at 284; *see also United States v. Ross*, 456 U.S. 798, 806–07, 102 S.Ct. 2157, 2163–64, 72 L.Ed.2d 572 (1982); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 1978–80, 26 L.Ed.2d 419 (1970); *United States v. Mendoza*, 722 F.2d 96, 100 (5th Cir.1983); *State v. Dorsey*, 731 P.2d 1085, 1087–88 (Utah 1986); *State v. Christensen*, 676 P.2d 408, 411 (Utah 1984); *State v. Droneburg*, 781 P.2d 1303, 1305 (Utah App.1989) (citing *Carroll*, 267 U.S. at 132, 45 S.Ct. at 280); *State v. Holmes*, 774 P.2d 506, 512 n. 6 (Utah App.1989). Thus, where as here, a vehicle is lawfully stopped based on a reasonable suspicion of criminal activity, a warrantless search is justified where the officers have probable cause to believe contraband is contained in the vehicle which may be lost if not immediately seized. *See State v. Larocco*, 794 P.2d 460, 468 (Utah 1990) (citing *Carroll*, 267 U.S. at 151–52, 45 S.Ct. at 284).

"The determination of whether probable cause exists ... depends upon an examination of all the information available to the searching officer in light of the circumstances as they existed at the time the search was made." *State v. Dorsey*, 731 P.2d at 1088 (citing *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). Probable cause for a warrantless search has been found to exist on facts similar to those in the present case. In *Mendoza*, drug enforcement agents conducted surveillance of a residence, and also followed individuals who had contact with the suspect who resided there. The agents observed several of these individuals driving "in a manner calculated to elude surveillance," *Mendoza*, 722 F.2d at 101, using pay telephones, and making several trips to and from a warehouse. While the court said that these facts may be consistent with innocent behavior, the totality of the circumstances justified a warrantless search of the suspects' vehicles. *Id.* at 101–02.

Similarly, in *Dorsey*, our supreme court upheld a warrantless search of an automobile where a police officer who was assisting other officers involved in an undercover narcotics purchase, followed defendant's truck and eventually stopped him. The court found that because the officer knew that a controlled narcotics purchase had been attempted; that two of the individuals had left the motel room where the negotiations were taking place; that someone involved in the transaction had on a dark leather jacket; and that defendant was wearing a dark leather jacket, probable cause existed. *Dorsey*, 731 P.2d at 1089.

Reviewing all of the information available to the officers in the present case, we hold that there was probable cause to justify a search. Officers Caldwell and Fox both testified that they observed drug paraphernalia and chemicals in plain view in the vehicle.[11] The officers also testified they had learned from Intertech what had been purchased by defendant, and that these items were commonly used in the manufacture of methamphetamine. Further, defendant could not explain why he purchased the items, or for whom they were purchased. While the officers' information at the time of the search might not be sufficient by itself to establish guilt, it

---

**11.** Although none of the officers testified they actually conducted a search of defendant's vehicle to locate these items, the record does indicate the officers obtained the Intertech invoice from the vehicle at some point. The invoice and photographs of the box containing the Intertech purchase were introduced as evidence at the suppression hearing. It is not clear whether these facts raise a "search" issue. Any "plain view" observations by the officers into defendant's vehicle would not constitute a search. *See State v. Lee*, 633 P.2d 48, 50–51 (Utah), *cert. denied*, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981).

was sufficient to establish probable cause. *See id.* Therefore, the trial court's determination that probable cause existed for the search was not erroneous.

## VALIDITY OF THE SEARCH WARRANT

■■■ Defendant's last claim is that the affidavit in support of the warrant to search his apartment contained nothing from which a detached and neutral magistrate could conclude that the apartment contained evidence of a crime. It is well established that a finding of "probable cause supported by oath or affirmation" is required for the issuance of a search warrant. *State v. Brown,* 798 P.2d 284, 285 (Utah App.1990) (citation omitted). In reviewing a probable cause determination, a magistrate's decision will be upheld if "the magistrate had a substantial basis for ... [determining] that probable cause existed." *State v. Babbell,* 770 P.2d 987, 991 (Utah 1989) (quoting *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

■■■ Contrary to defendant's assertion, the affidavit in this case is sufficient. Taken as a whole, the affidavit establishes that the affiant relied on his own and upon Fox's investigation and observations of defendant's conduct; that defendant had purchased several items which were known to be used in the manufacture of methamphetamine; that defendant gave false information as to where he resided, and when questioned about the Intertech purchase; and that Garza, with whom defendant shared the apartment, and who was arrested at the same time based upon the same facts as defendant, had previously been convicted for conspiracy to manufacture and distribute illegal substances. *See State v. Stromberg,* 783 P.2d 54, 57 (Utah App.1989) (probable cause determination supported by fact that defendant has previously been convicted of similar offense), *cert. denied,* 795 P.2d 1138 (Utah 1990). These facts, taken together, support the trial court's determination that probable cause existed for the issuance of the search warrant.

## CONCLUSION

We hold that the stop and subsequent warrantless search of defendant's vehicle, defendant's arrest, and the warrant search of defendant's home did not violate his rights, and therefore, the trial court's decision to deny defendant's motion to suppress the evidence found as a result of those searches was not clearly erroneous. The conviction is affirmed.

RUSSON, Judge (concurring in the result):

I concur in the result of the main opinion, but write separately because I prefer a different analytical approach to reach the same result. I would hold that probable cause to arrest Leonard existed at the time at which the officers stopped Leonard's vehicle. The facts which support probable cause include: (1) evidence that the continuing surveillance had resulted in several arrests and convictions relating to the possession and manufacture of methamphetamine; (2) Officer Fox's observation that Leonard's dress and manner were suspiciously inconsistent with those of a legimate businessman; (3) the Datsun truck's attempt to block Officer Fox from following Leonard; (4) Leonard's evasive driving manner, including driving at excessive speeds and making numerous illegal lane changes; (5) Leonard's apparent attempt to signal the occupants of the Datsun truck by waving bandanna-type flags out the window; (6) Officer Fox's discovery that no owner was registered for the license plates on the vehicle that Leonard was driving; and (7) the fact that Officer Caldwell had learned from Intertech what items had been purchased by Leonard and his companion, in concert with Officer Caldwell's knowledge that the said items are commonly used in the manufacture of methampetamine. On the basis of these facts, I would hold that the officers had probable cause to arrest Leonard when they stopped his vehicle, and that therefore the trial court properly denied Leonard's motion to suppress. Accordingly, I agree that Leonard's conviction should be affirmed.

ORME, Judge (dissenting):

In its brief, the State does not contend that there was probable cause to arrest defendant or subject him to anything more intrusive than a level-two *Terry* stop at the time the police officers effected the stop and asked their initial questions. Accordingly, the debate on appeal was principally directed to whether the police officers possessed the articulable suspicion necessary to justify a level-two encounter. I agree the officers had the requisite articulable suspicion to warrant a level-two stop. It does not follow, however, that what the officers actually effected was a proper level-two stop. Given the intrusive tactics employed by the investigating officers, I believe the main opinion errs in determining that the initial seizure was a level-two stop and not a de facto arrest requiring probable cause.

According to the record, the police officers stopped defendant because they suspected him of committing a non-violent felony—possession of equipment used in the manufacture of controlled substances. There were four police officers present, and three police cars, while only defendant and his female companion occupied the stopped vehicle. The stop occurred along the shoulder of a well-traveled highway, apparently during daylight.[1] At no time prior to the stop had the officers seen defendant or his companion in possession of a weapon, and the record provides no indication that the police had anything more than a pre-stop hunch that defendant might be dangerous. When defendant's vehicle came to a halt on the shoulder of the highway, defendant voluntarily exited the vehicle and walked toward the police cars. There is no evidence that defendant made furtive gestures, carried himself suspiciously, or otherwise approached the police in anything but a cooperative, non-violent manner.[2]

Nonetheless, Officer Fox testified that before questioning defendant, he ordered defendant to kneel down at the side of the highway. The female occupant of defendant's vehicle was placed in one of the police cars. Further, although neither Officer Fox nor Officer Caldwell recalled specifically whether any of the police officers drew their guns at the time they made the stop, Officer Fox claimed it was "very possible" guns were drawn, and Officer Caldwell stated that he "hoped" at least one of the officers had drawn his gun. Finally, Officer Fox testified that before questioning defendant, Officer Caldwell advised defendant of his *Miranda* rights.

A *Terry* stop "involves no more than a brief stop, interrogation, and, under the proper circumstances, a brief check for weapons." *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987). Anything beyond such a brief and narrowly-defined intrusion constitutes a de facto arrest, and probable cause is required. *See id.; Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). The accepted rule is that what might have otherwise been a level-two stop evolves into a level-three de facto arrest when, in view of all the circumstances, a reasonable, innocent person in the suspect's place would believe himself to be under arrest. *See United States v. Pinion*, 800 F.2d 976, 979 (9th Cir.1986), *cert. denied*, 480 U.S. 936, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987). *See also Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983) (characterizing relevant inquiry as whether the suspect believed he was being detained). Accordingly, in the course of a valid *Terry* stop the police may not, as a matter of routine, utilize methods which might commonly be employed incident to arrest. 3 W. LaFave, *Search and Seizure* § 9.2(d) at 366 (2d ed.1987).

---

**1.** Although the record does not state the time of the stop, other facts—i.e., that, just prior to the stop, officers had been conducting surveillance at a wholesale establishment open for business, and that officers clearly saw bandannas being waved from defendant's vehicle—indicate that the stop took place during daylight hours.

**2.** It would thus appear that any pre-stop concern the officers had about the potential dangerousness of defendant would have been largely dispelled by his non-confrontational approach. Any lingering concern could have been dispelled by a simple pat down of the sort permitted by *Terry*.

There is, however, one exception to this general proscription against intrusive police conduct. Police are permitted to employ a show of force or other exceptional methods during a *Terry* stop when such measures are reasonably necessary for the protection and safety of the investigating officers.[3] However, even then, the investigating officers must employ the least intrusive means reasonably available to effect the purpose of the stop. *See Royer*, 103 S.Ct. at 1325 (recognizing that, although permissible level of intrusion will vary with circumstances, least intrusive means must always be employed).

3. For situations in which police officers may draw weapons while effecting a stop, *see, e.g., United States v. Jones*, 759 F.2d 633, 638–39 (8th Cir.) (drawing weapons is permissible part of vehicle stop "if the police action is reasonable under the circumstances," taking into consideration "the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers...."), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir.1984) (display of weapons does not transform stop into arrest when suspected crime is a serious felony and stop was made in an isolated area); *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983) (drawing weapon acceptable when vehicle's occupant is suspected of bank robbery and is possibly under the influence of drugs, and the police officer is alone).

For situations in which police officers may require a suspect to lay down on the ground, *see, e.g., United States v. Laing*, 889 F.2d 281, 285 (D.C.Cir.1989) (when suspect ran toward apartment for which police had a warrant to search for guns and drugs, and suspect put his hand into his pants, it was acceptable for police to force suspect to lie on the floor), *cert. denied*, 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir.1983) (stop not invalid because police ordered suspect to lie on the floor, when suspect had disobeyed police commands to raise his hands and had made furtive gestures); *People v. Chestnut*, 51 N.Y.2d 14, 409 N.E.2d 958, 962, 431 N.Y.S.2d 485, 490 (ordering suspect to the floor was permissible when suspect was in company of man whom there was probable cause to arrest for an armed robbery that had just been committed, and police had witnessed a suspicious exchange between that man and the suspect), *cert. denied*, 449 U.S. 1018, 101 S.Ct. 582, 66 L.Ed.2d 479 (1980).

I agree that, in the instant case, the State has set forth sufficient facts to support a finding that the police had reasonable suspicion to *stop* defendant and make a level-two inquiry. However, given the circumstances of the encounter, I do not believe those same facts support a finding that the intrusive methods used by the police were necessary to protect the officers during the stop.[4] The State has provided no additional evidence to justify the officers' conduct.[5] Therefore, on the record before us, I believe the seizure to have been too intrusive to qualify as a level-two stop.[6]

4. The officers did not frisk defendant, or otherwise attempt to discern if he was carrying a weapon. This strongly suggests that, once defendant had been stopped and exited his car, the officers did not suspect he was armed. *Robertson*, 833 F.2d at 781. Other circumstances of the stop—the highway-side locale, the presence of four officers, the non-violent nature of the suspected offense, and defendant's non-furtive attempt to approach the police vehicles—also indicate the situation was not potentially dangerous, and that intrusive tactics were inappropriate.

5. The problem may essentially be a failure by the State, at the trial court, to develop the available evidence so as to meet its burden of proof. Little attention seems to have been given at the evidentiary hearing to what the police *did* in effecting the stop as opposed to what they *knew* in deciding to effect the stop.

6. Nonetheless, I might still be willing to view the facts as not moving the case from the level-two to the level-three pigeonhole if, at the time the seizure occurred, a reasonable, innocent person in defendant's place would not have believed himself to be under arrest. *See United States v. Pinion*, 800 F.2d 976, 979 (9th Cir. 1986), *cert. denied*, 480 U.S. 936, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987). I find such a possibility unlikely here. The police converged on defendant in three separate cars. The initial confrontation was somewhat hostile despite defendant's passivity, and may well have included a show of weapons by one or more officers. Defendant was ordered to his knees at the side of the highway, while his female companion was placed in the back of a police vehicle. Defendant was then informed of his *Miranda* rights. It is unlikely that, at this point in the encounter, a reasonable person in defendant's position would believe his seizure to be less than a level-three custodial one. Other cases have reached the same result in similar circumstances. *See, e.g., United States v. Delgadillo–Velasquez*, 856

It is the State's burden to show that the seizure it seeks to justify was sufficiently limited to satisfy the conditions of a level-two stop. *United States v. Williams*, 714 F.2d 777, 781 (8th Cir.1983) (quoting *Royer*, 103 S.Ct. at 1325–26). *See United States v. Al–Azzawy*, 784 F.2d 890, 894 (9th Cir. 1985), *cert. denied*, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). For the reasons discussed above, I believe the State falls short of satisfying that burden. *See also* note 4, *supra.* Accordingly, I would hold that the district court erred in determining defendant was subjected to a valid level-two stop, reverse the denial of defendant's suppression motion,[7] and remand with instructions to permit withdrawal of his guilty plea.

F.2d 1292, 1295 (9th Cir.1988) (*Terry*-stop of suspected drug dealers held invalid when police approached with guns drawn, ordered the suspects to lie down in the street, and handcuffed them, since the "show of force and detention used in this context are indistinguishable from police conduct in an arrest"); *Kraus v. County of Pierce*, 793 F.2d 1105, 1108–09 (9th Cir.1986) (under circumstances in which police turned spotlights on the suspects, drew their weapons, and ordered the suspects to drop to their knees, a reasonable person would have believed himself to be under arrest), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987).

7. The evidence seized from the car and from defendant's home is tainted by the illegality of his "arrest" on less than probable cause. Probable cause came into existence only when defendant made incriminating statements when in custody, but such custody was improper where it was supported by nothing more than an articulable suspicion.